(79 South. 367)

KENAN, McKAY & SPIER v. HOME FERTILIZER & COTTON OIL CO.
(4 Div. 797.)

(Supreme Court of Alabama. June 27, 1918.)

1. SALES ☞71(4)—LINTERS—CONTRACT—NUMBER OF BALES — RULES OF ASSOCIATION — "ESTIMATE."

Statement of "expectation to make some 500 bales, but we may have * * * 700 bales, then it might not exceed 300 bales" is not an "estimate," within rule of Cotton Seed Crushers Association, as to sale of season's output of linters, when "estimated" number of bales is stated.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Estimate.]

2. SALES ☞71(4)—SEASON'S MAKE—OBLIGATION TO RUN MILL.

Contract of sale of "season's make" of linters imposes no obligation to operate mill to produce linters.

3. SALES ☞71(4)—SUBJECT-MATTER—QUANTITY—OUTPUT OF PLANT.

Where the seller engages to sell and deliver the output of his plant and the buyer engages to take and pay therefor, the buyer is liable to the seller for the damages resulting from the refusal of the buyer to receive and pay for the make or output that the seller's plant has actually produced.

Appeal from Circuit Court, Henry County; H. A. Pearce, Judge.

Action by Kenan, McKay & Spier against the Home Fertilizer & Cotton Oil Company. From an adverse judgment, plaintiff appeals. Affirmed.

The plaintiff (appellant) suffered a nonsuit because of the adverse rulings of the court in sustaining the defendant's (appellee's) demurrers to counts 4 and 5 of the amended complaint. These counts, so far as presently important, read:

(4) The plaintiff claims of the defendant the further sum of three thousand, eight hundred fifty ($3,850.00) dollars, damages, with interest thereon from the 31st day of July, 1916, for the breach of the contract or agreement made and entered into by the plaintiff and the defendant, on or about the 10th day of July, 1915, and procured through C. G. Hewitt, as a recognized broker of cotton seed products, and at the instance of both parties thereto, which contract was accepted, acted upon and confirmed by the plaintiff and also by the defendant, under and by virtue whereof the defendant sold to the plaintiff and the plaintiff purchased from the defendant all the defendant's season's make of mill run linters for the season of 1915–1916, at and for the price of three and one-half cents per pound f. o. b. cars at defendant's mill, at Headland, Alabama, to be delivered in lots of 25 bales as made during the season of 1915–1916, which said contract is herewith set out in words and figures as follows, to wit:

"C. G. Hewitt, Broker, Montgomery, Ala., July 10, 1915. Corrected Contract. Sold to: Kenan, McKay & Spier, Atlanta, Ga. Account of: Home Fertilizer & Cotton Oil Co., Headland, Ala. Quantity: Season make 1915–1916. Quality: Mill run linters. Price: Three and one-half cents per pound f. o. b. cars at mill, Headland, Ala., buyer paying commission. Shipment: In lots of 25 bales as made. Terms: Cash against documents. Rules: Alabama Cotton Seed Crushers Association.

"C. G. Hewitt, Broker."

"Accepted:

"The Home Fertilizer & Cotton Oil Co.
"L. T. Solomon, Treas."

Plaintiff avers that under and by virtue of the stipulations of said contract the rules of the Alabama Cotton Seed Crushers Association for the season 1915–1916, so far as they relate to and deal with the sale and the purchase of cotton seed linters, enter into and form part of said contract, and sections 1, 2, 3 and 4 and 5 of rule 15 of said Alabama Cotton Seed Crushers Association for the season 1915–1916, covered the subject of linters, their sale and purchase, as stipulated therein; which said sections of rule 15 of said association provide as follows, to wit:

"Linters.

"Rule 15.—Section 1. Cotton seed linters shall be governed in sale by special contract 2.

"Sec. 2. Mill run linters shall be made from reginning cotton seed, without regard to grade, and shall be free from flues or lint obtained from threshed seed or grabots.

"Sec. 3. When a sale is made of season's or balance of season's output of linters, the seller must ship and the buyer must receive all the linters seller makes to the end of the season, provided, that when estimated number of bales is stated in contract, or in confirmation of sale or purchase, the buyer may demand and seller must ship, or may ship whether demanded or not, 15 per cent. in excess of estimated quantity if he makes a sufficient number of bales to enable him to do so, and buyer must receive and pay' for same at contract price. Should seller not make the quantity estimated, he shall deliver the number of bales made, and shipment of 85 per cent. of the estimated quantity shall be deemed a fulfillment of the contract. The limitation of each season shall be the 31st of July, so that each season's output of linters shall include everything made up to July 31st.

"Sec. 4. Should a buyer fail to give shipping instructions for linters or to receive them when shipped in accordance with the terms of the contract, the seller may, after proper notice to the buyer, cancel the contract or sell the linters in dispute through a recognized broker for the buyer's account and any loss sustained will be a valid claim against the buyer. Conversely, a buyer may protect himself in case of nondelivery of linters bought.

"Sec. 5. Weights and Packages. A bale of linters for contract purposes is five hundred pounds gross weight, with a maximum or minimum allowance of 5 per cent. No claim shall be made unless loss in weight exceeds one-half of one per cent. Bales weighing less than 350 pounds may be rejected by buyer.

"Merchantable linters must be suitably baled and tied and free from country damage. But country damage, if properly allowed for, shall not be a bar to delivery on contract."

Plaintiff avers that defendant, in confirmation of the sale and the purchase of said linters, and at the time the contract was executed by it, made an estimate of the number of bales it would make during the season of 1915–1916, and covered by said sale and by said contract, said estimate being made in writing and delivered to said broker, C. G. Hewitt, at the same time and together with the contract as executed by defendant, which estimate is in words and figures as follows, to wit:

"Home Fertilizer & Cotton Oil Company. Headland, Alabama, July 12, 1915. Mr. C. G. Hewitt, Broker, Montgomery, Ala.—Dear Sir: Your favor of the 10th inst. is before me and noted. In reply beg to say we will make only a mill run of linters this season and with reference to the quantity of these linters we cannot tell how many bales we will make, and would like the contract to read for output. Of course it is our expectation to make some 500 bales, but we may have as much as 700 bales, then it might not exceed 300 bales, but we want what we .make to be delivered on the contract, and this is our understanding in offering the linters for sale at this time. Yours very truly, L. T. Solomon, Mgr."

\*    \*    \*    \*    \*

"Plaintiff avers that the freight on said linters from Headland, Ala., to Atlanta, Ga., during the season of 1915–1916, was —— per bale, and further avers that defendant violated its duty which it owed to plaintiff when it refused and failed, during the season of 1915–1916, to deliver to plaintiff, at its mill, Headland, Ala., the said 180 bales of mill run linters and as a proximate result thereof, plaintiff was forced to go into the markets and to buy other linters of the same class to supply for those which defendant failed to deliver under its contract, which it did as expeditiously and as cheaply as it reasonably could, and paid therefor 8 cents per pound delivered in Atlanta, Ga., and thereby sustained damages in the sum of $3,850, said sum being the difference between the contract price of said 180 bales of mill run linters, in Headland, Ala., and the price plaintiff had to pay for same grade and class of linters delivered in Atlanta, Ga., together with the interest thereon from the 31st day of July, 1916, wherefore plaintiff sues."

Count 5, omitting pertinent portions common to counts 4 and 5, reads as follows:

"(5)   \*   \*   \*   Plaintiff avers that under said contract and the said rules of the Alabama Cotton Seed Crushers Association, it purchased from the defendant and obligated and bound itself to accept and pay for all the mill run linters which defendant made during the season of 1915–1916; and also the defendant sold and agreed to deliver to the plaintiff, at its mill, in Headland, Ala., during the season of 1915–1916, in lots of 25 bales as made, all its mill run linters which it should make during said season.

"Plaintiff avers that according to the stipulations of section 3 of rule 15 of said Alabama Cotton Seed Crushers Association the season of 1915–1916 terminating [terminated] on the 31st day of July, 1916.

"Plaintiff further avers that under said contract the defendant was bound in good faith, with due diligence to operate its mill in its usual and ordinary capacity during the entire season of 1915–1916, and thereby to produce whatever mill run linters said mill, operated in such manner, would make; and that the plaintiff was bound in good faith, to receive and pay for all the mill run linters which said mill so operated would or should produce during said season.

"Plaintiff avers that had defendant used due diligence in the operation of its mill, and operated the same at its usual and ordinary capacity during the full season of 1915–1916, said mill could have and would have made at least 300 bales of mill run linters of 475 pounds each gross, which under said Cotton Seed Crushers Association's Rules is a minimum contract bale.

"Plaintiff further avers that defendant did not use due diligence in the operation of its mill, nor did it operate the same at its usual and ordinary capacity during the entire season of 1915–1916, but to the contrary when the price of raw cotton seed advanced and became high, it discontinued the operation of its mill altogether, and shut the same down early in the sason, to wit, on or about the —— day of ——, 1915, and failed and refused to operate said mill any more during said season, and failed and refused to make and deliver to plaintiff the 300 bales of mill run linters which it could have made, and would have made during said season, had its mill been diligently operated, and run at its usual and ordinary capacity during the entire season; that defendant delivered to plaintiff under said contract and during the said season 75 bales of mill run linters, leaving undelivered of the number of bales which it could have made, and would have made during said season, had it diligently operated its mill in good faith, and at its usual and ordinary capacity throughout the season, 225 bales of mill run linters of the minimum weight of 475 pounds per bale."

The court below gave effect to the view that the contract declared on did not oblige the defendant (appellee) to manufacture or ship any definite number of bales of "linters" during the period stipulated, a conclusion fatal to the sufficiency of the fourth count; and, also, as respected the fifth count, that the contract declared on did not oblige the defendant to produce "linters" by operating

its mill during the period stipulated in the count.

R. W. Miller, of Abbeville, and Payne & Jones, of Atlanta, for appellant. Lee & Tompkins, of Dothan, for appellee.

McCLELLAN, J. [1] Since pertinent rules of the Alabama Cotton Seed Crushers Association were made a part of the contract, with particular reference to section 3 of rule 15 set out in the statement of the case, ante, the appellant insists that the letter of defendant's manager, set forth in count 4, effected to afford an estimate of the amount of the production, within the contemplation of that section (3) of rule 15. It may be remarked, at this point, that the exigencies of this case do not require a construction of section 3 of rule 15. The letter is to be read and interpreted in the light of the circumstances surrounding and relating to the transaction and of the manifested purposes of the parties. As we understand the terms of the letter—and they are not at all obscure —the clear intent was not to undertake to give an estimate of the mill's production of "linters," but, on the contrary, to merely recite an expectation on the part of the writer with respect to the amount of "linters" the mill might produce. The figures employed in the letter token the entertainment by the writer of an opinion that was markedly uncertain. The writer, himself, recognizing this uncertainty, expressly stated his company's desire to only engage to sell the output of the mill, thereby implying, necessarily we think, that the obligation assumed should only comprehend what the mill made. This idea was repeated, and thereby emphasized, through the expression, in the concluding lines of the letter, that the seller's engagement was, and should be so understood, to impose the obligation to only deliver "what we make," thereupon excluding the possibility of an undertaking on the part of the seller to deliver any particular quantity, estimated or otherwise. Count 4 proceeded on an opposite theory, and was hence subject to the demurrer.

[2, 3] In order to attribute error to the trial court in sustaining the demurrer to the fifth count, it must be concluded that the contract declared on required the defendant to operate its mill, at least when practicably possible to do so, during the period stipulated, and, in consequence, obliged it to produce "linters" for delivery to the plaintiff. We find in the contract no such obligation. The seller engaged to sell its "make" of "linters." It did not obligate itself to make any "linters." There was no manifestation of an intent to so engage. The terms employed disclose that the seller's purpose was to sell "what we make," the season's make, no purpose to engage to sell a definite or even an estimated number of bales of "linters." It is not possible to imply an obligation to make an article from an assumption of the limited obligation to sell, not a definite number of an article, but simply, merely, what the seller makes. Where the seller engages to sell and deliver the output of his plant and the buyer engages to take and pay therefor, the buyer is liable to the seller for the damages resulting from the refusal of the buyer to receive and pay for the make or output that the seller's plant has actually produced. McIntyre Lumber Co. v. Jackson Lumber Co., 165 Ala. 268, 51 South. 767, 138 Am. St. Rep. 66. In such case the certainty, as well as the mutuality, essential to support the contract is afforded by the act, the outlay of the seller in performing the contract to the extent at least of producing, as upon the promise of the buyer to receive and pay for, the article the contract describes, satisfactorily to the doctrine stated in McIntyre Lumber Co. v. Jackson Lumber Co., supra, and also in Evans v. Railway Co., 78 Ala. 341, 345, 346; Sheffield Fur. Co. v. Hull, 101 Ala. 446, 477, 14 South. 672; Pratt Coal Co. v. Short, 191 Ala. 378, 390, 391, 68 South. 63. Jones v. Lanier, 73 South. 535,[1] was an action by the seller against the buyer, and involved considerations not pertinent to the present appeal. The decision in Loeb v. Cotton Oil Co. (Tex. Civ. App.) 93 S. W. 515—an action by the seller against the buyer for damages resulting from the refusal of the buyer to receive 66 bales of "linters" that the seller had manufactured and tendered within, according to the decision of the court, the terms of the contract—illustrates the doctrine to which we have just adverted. The Court of Appeals of Georgia, in Dawson Cotton Oil Co. v. Kenan et al. (Ga. App.) 94 S. E. 1037, accepted, in effect, the doctrine just stated, and from it, as a premise, held that the seller was bound by the contract to make "linters," to operate its mill, unless prevented by excusing causes; this, in order to avert what the court conceived to be the unavoidable, undesirable consequence of deciding that the parties had made a unilateral contract, a contract binding one and not binding the other of the parties. While yielding the utmost deference to the learned court so pronouncing, this court cannot accept its conclusion in the premises. Since there was originally no obligation assumed by the seller to make the article, to operate its plant, the buyer's obligation to receive what the seller actually made is referable to the fact that the seller acted upon the buyer's promise and engagement to take what the seller made, whereupon, in our opinion, it results that the alternative, to which the learned Georgia court gave its approval, of either reading the contract to bind the seller to make the article, to operate its mill, or, on the other hand, of pronouncing the contract unilateral, was not presented for acceptance;

<hr/>

[1] 198 Ala. 363.

the buyer's obligation to receive and pay for the articles actually made by the seller being predicated of the seller's obligation to deliver to the buyer all of the article made by the seller's plant. The seller having acted upon the buyer's promise to take his output, the buyer becomes bound to take what the seller has made, in reliance upon the buyer's promise, and the seller becomes likewise bound to deliver the output of his plant. Certainty, consideration and mutuality are all afforded and present in such circumstances. This is the doctrine of McIntyre Lumber Co. v. Jackson Lumber Co., supra; and its effect was given concrete illustration in that decision. In sustaining the demurrer to the fifth count, the court correctly concluded that the contract therein declared on did not require the defendant to make "linters," to operate its mill.

The judgment is affirmed.

Affirmed.

ANDERSON, C. J., and SAYRE and GARDNER, JJ., concur.