FRANK McNUSSEN ET AL., PLAINTIFFS AND RESPONDENTS, *v.*
EUGENE W. GRAYBEAL AND PATRICIA R. GRAYBEAL,
DOING BUSINESS UNDER THE FIRM NAME AND STYLE OF MISSOULA
CREAMERY AND COLD STORAGE, DEFENDANTS AND APPELLANTS.

No. 10780
Submitted May 18, 1965. Decided August 17, 1965.
Rehearing denied September 21, 1965.
405 P.2d 447

See also McNussen v. Graybeal, 141 Mont. 571, 380 P.2d 575.

Smith, Boone & Karlberg, Russell E. Smith (argued), Missoula, for appellants.

Wallace & Turnage, Jean A. Turnage (argued), Polson, Jay M. Kurtz (argued), Missoula, for respondents.

MR. CHIEF JUSTICE JAMES T. HARRISON delivered the Opinion of the Court.

Defendants-appellants Graybeal, milk processors and distributors, doing business under the same of the Missoula Creamery and Cold Storage Company, bring this appeal, from the District Court of the Fourth Judicial District in and for the County of Missoula, from a judgment rendered in a jury trial in favor of plaintiffs-respondents, twelve dairy producers, to wit: Frank McNussen, Clarence Erickson, Alvin Pedersen, Walter Schock, F. A. Lynch, Arnold Zerbst, Ernest Lee, Wesley Leishman, William Eldridge, Clark A. Griffiths, Robert Roseleip, Jr., and Cliff Hendrickson.

In brief, plaintiffs alleged in their complaint that they were

producers of milk; that defendants for a long period of time prior to September 6, 1961, had been daily purchasing plaintiffs' milk; that on September 6, 1961, a written agreement was entered into between the parties (hereafter quoted); that under the agreement plaintiffs sold and delivered to defendants all the milk produced by them from September 1, 1961, to and including September 29, 1961, being 10,150 pounds of butter fat, at the agreed price of $1.33 per pound or $13,499.50; that defendants paid therefor $12,890.50, leaving balance due of $609.00, which plaintiffs claimed.

For a second claim plaintiffs re-alleged pertinent portions of the first claim and alleged that they had performed their part of the agreement and were ready to continue, but on September 30, 1961, defendants refused to accept their milk or pay the price provided in the agreement; that by reason thereof plaintiffs sought to sell the milk on the market and were unable to sell the milk for more than 80¢ per pound of butter fat; that by reason of such facts plaintiffs lost and were deprived of their profits amounting to $122,325.00, which plaintiffs claimed.

Defendants' answer to the first claim admitted the written agreement was signed by them, but denied it was a contract, alleging it to be effective only as an offer and subject to revocation at any time.

As to the second claim it was generally denied.

In their first affirmative defense defendants allege the agreement was executed by them by reason of duress exercised by the plaintiffs upon them.

In their second affirmative defense defendants allege the agreement is void because it is the product of an illegal conspiracy formulated by plaintiffs, is contrary to public policy and the statutes and Constitution of Montana.

In their third affirmative defense defendants alleged that on October 30, 1961, they mailed to each plaintiff a notice (hereafter quoted); that following receipt of such notice plaintiffs

continued to ship milk to defendants who paid them for such milk in accordance with the terms of the notice.

The claims are founded upon the following contract, drawn by the plaintiffs and signed by the individual plaintiffs and the defendants, acting through defendant E. W. Graybeal, each in the presence of the other.

"Agreement
"State of Montana

"Agreement between the Dairy Fresh Creamery and Cold Storage Plant of Missoula and their milk producers of Lake County.

"We of the Dairy Fresh Creamery agree to pay the following prices starting as of September 1, 1961, to August 31, 1963. Starting September 1, 1961, to the end of the Missoula School Term 1962, prices for all milk will be $1.33 per pound of butter fat. From the end of the Missoula School Term to August 31, 1962, the price per pound of butter fat will be $1.24. From September 1, 1962, until the end of the School Term 1963 the price paid per pound of butter fat will be $1.33. From the end of the Missoula School Term 1963 until August 31, 1963, the price per pound of butter fat will be $1.24.

"All prices above are delivered to the Missoula plant.

"This agreement can only be changed by the Montana Milk Control Board under the Laws of the State of Montana. Signed by Dairy Fresh Creamery and Cold Storage Company of Missoula, /s/ E. W. Graybeal.

"Signed by the Chairman of the Dairy Fresh Creamery and Cold Storage Company Milk Producers of Lake County, Montana. /s/ Clarence Erickson. Witnesses: Frank McNussen, Wesley Leishman, and Robert Roseleip, Jr.

AMENDMENT NO. 1.

September 6, 1961.

"Amendment to this Agreement, that we the undersigners cannot be terminated until this agreement expires, dated

August 31, 1963. We are to be paid twice monthly, for all milk. Witnesses Frank McNussen, Wesley Leishman, Robert Roseleip, Jr., /s/ Frank McNussen, Wesley Leishman, Ernest Lee, F. A. Lynch, Clark A. Griffiths, Robert Roseleip, Jr., Wm. Eldridge, Cliff Hendrickson, Clarence Erickson, Walter Schock, Arnold Zerbst, Alvin Pedersen, George Fryberger.

"Signed by Missoula Dairy Fresh Creamery and Cold Storage Company. /s/ E. W. Graybeal."

From the record it appears that plaintiffs produce Grade A milk. The defendants process Grade A milk into milk for drinking (called Class One) and ice cream (called Class Two). If on a given day, after taking all the milk required to maintain the market supply for milk and ice cream, the defendants had on hand any excess or left-over milk they would be unable to use it since their Missoula Plant does not process milk for cheese and similar milk products. This left-over milk is referred to as "surplus" milk.

By way of example, if the plaintiffs' cows produced a thousand gallons of milk on a given day, and the defendants only required 800 to keep their market at its normal level, then there would be a surplus of 200 gallons of milk.

It is not necessary here to explain the complicated price structure of the milk industry. Suffice it to say that the use to which Grade A milk is put by the processor, i.e., processed for drinking, or for ice cream, or for cheese, determines its value to the dairy farmer. The Montana Milk Control Board fixes the price to be paid to the farmer for milk used in Class One (drinking) and in Class Two (ice cream) but does not fix the price to be paid for milk used in Class Three (cheese). Under the fixed price the dairy farmer would be paid $1.45 per pound of butter fat for that amount of his milk processed for drinking purposes, and be paid $1.00 per pound of butter fat for his milk processed for use in ice cream.

In the instant case, surplus milk was sold to a cheese processing plant in Ronan. There is no fixed price for milk diverted

to the cheese plant, the price fluctuating according to its butter fat content and current market demands for the product.

The dairy farmers are paid for their milk according to a "blend price" system. The figures appearing in the above contract are blend price figures. The blend price is, if not fixed as in the above contract, determined by adding together the value of all milk used in the three separate Classes and dividing the total by the total quantity of milk involved. In this case it can easily be seen that the only value which is variable is the value of the surplus milk, all other values being fixed, including the blend price.

. This dispute centers upon whether "all milk" as used in the contract means that the defendants must accept all the milk produced by the dairy farmers, or whether the defendants must accept only so much milk as they require or need on a given day.

The facts show that most of the plaintiffs had supplied milk to the defendants for several years. No written contracts existed between them prior to September 6, 1961, when the foregoing contract was signed. Until that time, the parties relied upon oral understandings.

The parties agree that in August 1961, an oral agreement was entered into wherein the plaintiffs were to supply the defendants with all the milk they could use at a blend price of $1.10 per pound of butter fat, and that such surplus milk as the defendants could not use would be sold by the plaintiffs themselves, and not by the defendants as had been the practice prior to August 1961. Prior to August 1961, the defendants accepted all milk produced by the plaintiffs and sold the surplus themselves, refunding a part of money realized by such sale to the plaintiffs.

On September 5, 1961, the plaintiffs met with the defendant, E. W. Graybeal, showed him the above written contract (which at that time did not contain the amendment) and requested that he sign it, or, pursuant to an agreement between the plain-

tiffs, no more milk would be delivered to the defendants. The defendant Graybeal refused to sign. The following day most of the plaintiffs withheld delivery of their milk. Later, on September 6th, however, the defendant Graybeal held a meeting with the plaintiffs and at that time signed both the contract and the amendment thereto on behalf of the defendants.

There is considerable conflict of testimony as to what was said at both meetings concerning both the contract and the issue of which party was to handle any surplus milk.

The plaintiffs began shipping their milk to the defendants on September 7, 1961, in much the same manner as shipments had been made in the past, that is, the delivery truck driver would learn from the foreman of the creamery plant in Missoula how much milk would be required that day, then he would pick up the milk cans at the dairy farms, deliver any quantity over the amount required at the Missoula plant to Ronan on his trip south, and then deliver the remaining milk, being the amount requested, to the Missoula plant. This system of delivery, from what evidence is available in the record, seems to have been the method regardless of whether the surplus was under the control of the defendants or the plaintiffs.

On October 20, 1961, the plaintiffs filed the complaint initiating this action. On October 30, 1961, the defendants sent to each of the plaintiffs the following letter dated October 30, 1961:

"Reference is made to the purported contract, alleged in the complaint which you have filed in the District Court of Lake County, to have been made on September 6, 1961.

"This is to notify you that there is no contract between us. We will take such of your milk as we wish at the combined price established by the Montana Milk Control Board on a usage basis. We will not pay more. If you do not wish to deliver milk at those prices, you are free to find another market. We do not agree to take any specific quantity of your milk

although we will give your hauler a day's notice if for any reason we are unable to use any milk produced by you.

"Yours very truly

"MISSOULA CREAMERY AND COLD STORAGE COMPANY

"By: /s/ Eugene W. Graybeal."

The contract in this case was drawn by laymen. It is first necessary to determine what kind of contract was negotiated between the parties, and whether it is valid or void, in whole or in part.

The jury were properly instructed and directed to determine the meaning of "all milk" as follows:

"Instruction No. 13. If you determine that Exhibit 1 [the written contract] constituted a valid contract, then you must, from all of the evidence, determine the meaning of 'all milk' as used in Exhibit 1. Does this mean:

"1. All milk produced by the plaintiffs?

"2. All milk which the defendants might purchase from the plaintiffs and use in their creamery operations?"

The verdict in favor of plaintiffs clearly implies that the jury found the intentions of the parties to be that "all milk" meant that "all milk produced by the plaintiffs," including any surplus, was to be accepted and paid for by the defendants.

Proper classification of the contract disposes of several of defendants' numerous specifications of error. Lacking the above jury determination as to the meaning of "all milk," the contract could easily be classified as either a "requirement" or an "output" contract, depending upon from which side of this action the contract is viewed.

The decision of the jury, however, confirms that the contract should be classified as an output contract, and our review of the evidence shows by a preponderance thereof that the contract is properly so classified.

It will be noted that section 87A-2-306 of Montana's newly-

adopted (January 1965) Uniform Commercial Code specifically recognizes output contracts, requiring parties to such contracts to deal with each other in good faith. However, the Uniform Commercial Code became effective in Montana subsequent to the trial and appeal of this case.

Agreements to sell all the output or services as a party may produce to another party are described in 1 Williston on Contracts, § 104A, pp. 403-404, as "output" contracts, as compared to "requirement" contracts, wherein the buyer promises only to accept that quantity which he needs or requires.

A sale of the entire output of a certain article, produced by the seller during a specified time, binds the seller to deliver, and the buyer to accept all that the seller produces, and such a bargain by the seller to sell all that he produces does not lack consideration. See generally 77 C.J.S. Sales § 172, at pp. 909-910; see also 28 Col.L.Rev. 784.

A promise to buy of another all of a commodity produced, or a promise to sell all of a commodity to another, serves as sufficient consideration for a return promise to sell or buy respectively, whether express or implied. In Kentucky Tobacco Products Co. v. Lucas, D.C., 5 F.2d 723, the court implied a promise to sell the entire output where the contract contained only an express promise to buy the entire output. In the case at hand, the defendants promised that "We of the Dairy Fresh Creamery agree to pay the following prices * * * for all milk * * *." This contract was drawn by the plaintiffs. It does not strain the rules of construction to imply the plaintiffs' promise to sell in this situation—thereby creating mutuality, or consideration, and a binding bilateral contract.

"The courts in passing upon the validity of the contracts have examined them with the test of 'mutuality' and * * * have professed to find the bargain equivalent of the buyer's promise in the seller's promise not to sell his product to anyone else, or the fact that the seller would have to shut down his plant to avoid the contract. But the buyer's purpose in

making the contract is usually not to prevent other buyers from obtaining the product, or to force the seller out of business. His purpose is to get what the seller produces and the seller's promise to deliver it is what he is bargaining for." 28 Col.L. Rev. at 785.

■ By the weight of authority, there is no longer any doubt that output contracts may be enforced. The necessary implied promise of the output seller not to sell to anyone else furnishes all the consideration necessary for the counter-promise of the buyer. Generally see 27 Ill.L.Rev. 1; 2 Duke B.J. 187. For a thorough listing of cases, see Anno: 1 A.L.R. 1392; Anno: 9 A.L.R. 276; Anno: 23 A.L.R. 574; and the supplements thereto.

■ Output contracts are to be given a practical interpretation that will effectuate and not defeat the common intention. Mantell v. International Plastic Harmonica Corp., 141 N.J.Eq. 379, 55 A.2d 250, 173 A.L.R. 1185. It would seem, therefore, that it is neither necessary nor desirable to adopt the same interpretations in all output cases. Different businesses, different materials, the subject of the contract, and different classes of cases may require the application of different rules of construction. We are satisfield that reiteration of the more general rules and considerations, instead of specific case authority applicable to this case only through analogy, will better dispose of this case and better pave the way for future output contract interpretation.

■■ The usual rules as to certainty and definiteness respecting quantity are inapplicable in output contracts since sufficiently definite standards by which performance can be tested are afforded due to the fact that the parties know and understand the business situation of the seller, the capacity of his plant, and what it has produced in the past so that its output under normal circumstances can be reasonably ascertained. A long line of cases support the theory that the seller must act in good faith concerning the quantity of his production and

not take advantage of a good contract in a rising market through over production. The Uniform Commercial Codes adopt the good faith approach. See 1 Williston on Contracts, § 104A; 28 Col.L.Rev. 784 at 787; 77 C.J.S. Sales § 63c at 713.

"Where the seller engages to sell and deliver the output of his plant and the buyer engages to take and pay therefor, the buyer is liable to the seller for the damages resulting from the refusal of the buyer to receive and pay for the make or output that the seller's plant has actually produced. * * * In such case the certainty, as well as the mutuality, essential to support the contract is afforded by the act, the outlay of the seller in performing the contract * * *." Kenan, McKay and Spier v. Home Fertilizer and Cotton Oil Co., 202 Ala. 29, 79 So. 367.

The contract at hand, under the above authority, is a valid bilateral output contract.

It could not be revoked at the whim or will of but one of the parties thereto and against the wishes of the other. The letter sent to each of the plaintiffs by the defendants on October 30, 1961, did not affect the validity of the written contract in the least.

The defendants claim that the contract of September 6, 1961, is void for duress. The statute on duress in Montana is specific.

"13-303. *Apparent consent—when not free.* An apparent consent is not real or free when obtained through:

"1. Duress; * * *."

Section 13-305, R.C.M. 1947, provides in relevant part:

"*Duress—in what it consists.* Duress consists in:

"2. Unlawful detention of the property of any such person; or * * *."

Upon the evidence, the claim of duress in the case at bar could only fall within the quoted subsection 2. The defendants apparently argue that if a valid contract existed between the plaintiffs and the defendants as a result of the oral August, 1961, agreement, then the non-delivery of milk on September 6, 1961, was an unlawful act constituting duress, therefore void-

ing the written contract of the same date. It would seem, then, that the defendants argue that under the oral agreement the milk produced from day to day, whether delivered or not, whether paid for or not, whether accepted or not, was the property of the defendants from the moment of its existence until formally rejected or refused by the defendants. Such reasoning is not sound. Nor is any claim sound which rests upon an implied right to milk produced by the plaintiffs belonging to the defendants. The defendants had no absolute right to any milk produced by the plaintiffs under the oral agreement of August. That agreement is in the nature of a "requirement" contract. In that instance, however, the agreement is void for lack of mutuality.

The facts there are these: During August, the defendants required a greater quantity of milk than the plaintiffs produced. During that same period, the defendants looked to other producers for milk to supplement that which they accepted from the plaintiffs. The oral agreement, as stated in the instructions given the jury, was to the effect that the plaintiffs agreed to sell to the defendants all of the plaintiff's milk that the defendants could use. In this context, "could use" is not a phrase of need or requirement, but rather a phrase of wish or desire. The defendants were not obligated to accept any of the plaintiff's milk, regardless of their actual plant needs. The facts show that though the defendants did in fact need and require more milk than the plaintiffs produced, they did not accept all of their milk. The oral agreement imposed no obligation upon the defendants to accept the plaintiffs' milk. They promised nothing. They could accept or refuse plaintiffs' milk as they chose or wished, and not as needed or required. The oral agreement, if anything, amounted to a series of unilateral agreements, binding only as to milk offered and then accepted.

The withholding of delivery of milk on September 6, 1961, was not an unlawful act. Such milk was not the property of the defendants in any sense. No duress was occasioned by

the stoppage of delivery within the scope of R.C.M.1947, section 13-305.

The defendants contend further that the threat to stop delivery of milk was sufficiently coercive to allow this court to invalidate the September contract on the theory of economic duress. Such a contention is without merit in this case. The plaintiffs committed no act legally or morally wrongful, unjust or unconscionable.

Economic duress, not known to the common-law doctrine of duress, is equitable in nature. But even with this modern expansion of the doctrine, wrongful or unlawful conduct is still found to be an essential element in the vast majority of cases. Anno: 79 A.L.R. 655.

"Save under exceptional circumstances, the threatened act must be wrongful * * * and certainly there is no broad doctrine forbidding a person from taking advantage of the adversity of another to drive a hard bargain." 5 Williston on Contracts, § 1618.

As above stated, the plaintiffs committed no illegal or unlawful act. The right was theirs to insist upon a written contract and to put into it any terms or conditions they desired. If anything, the contract served to remove an adversity attendant upon the plaintiffs, and, if in so doing, some advantage was gained due to the particular bargaining power of the parties, that does not, in this case, amount to economic duress. See generally 4 Corbin on Contracts, § 642; 17 C.J.S. Contracts § 177.

It is well-settled law that the question of whether an ambiguity exists is one of law for the court. But, where there is a conflict of testimony as to what were the intentions of the parties toward the use of the ambiguous word, determination of the true meaning is one of fact for the jury. In National Cash Register Co. v. Wall, 58 Mont. 60, 62, 190 P. 135, the court, in construing the word "special" to be ambiguous, said:

"* * * Indeed, without a description * * * *aliunde* the contract

itself, it is difficult to conceive how a jury could understand the meaning of the word 'special,' unaided by an account of the circumstances and the conversation leading up to the making of the contract and the meeting of the minds of the parties upon the particulars necessary to its consummation. * * * In no other way could the issues the jury were called upon to settle be made intelligible to them."

Further, sections 13-702 and 13-713, R.C.M.1947, explicitly allow extrinsic evidence to explain the true intentions of the parties where a word is found to be ambiguous.

Although under strict rules of admissibility of evidence applying to regular contracts, much of the evidence admitted in this case would have or should have been rejected, such is not the case here for at least two reasons: First, the contract was ambiguous; and, second, a contract in the nature of an "output" contract must be interpreted in light of circumstances surrounding the parties and prior business dealings. Therefore, although some evidence admitted might technically be objectionable, we cannot see where such evidence has prejudiced the defendant. By far the most important determination for the jury to make was the true meaning of the words "all milk." The evidence running to that matter was properly admitted. Other evidence which might have been objectionable in our view did not prejudice the jury in its determination of the meaning of "all milk."

Finally, the defendant argues that the contract was void for illegality under Article XV, § 20 of the Montana Constitution, and R.C.M.1947, § 94-1104. This contention is without merit. The plaintiffs did not conspire to fix prices, nor was that the effect of their agreement not to sell their milk for less than a reasonable amount. Nothing done by plaintiffs was illegal or unlawful in this respect.

The judgment is affirmed.

MR. JUSTICES ADAIR, DOYLE, CASTLES and JOHN C. HARRISON concur.