UNITED STATES FIDELITY AND GUARANTY COMPANY, a Maryland Corporation, Plaintiff,

v.

Earl H. NEWMAN and Ray C. Newman, d/b/a Newman Construction Company, Michael David Newman, Harold Hall, Personal Representative of the Estate of Deborah Hall, Deceased, Harold Hall and Annabelle Hall, Husband and Wife, Timothy Overbey, Farmers Group, Inc., d/b/a Farmers Underwriters Association, Attorney-in-fact for Farmers Insurance Exchange, Defendants.

No. CV 77–58–GF.

United States District Court,
D. Montana,
Great Falls Division.

Sept. 26, 1979.

Robert J. Emmons, Smith, Emmons, Baillie & Walsh, Great Falls, Mont., for plaintiff.

Robert W. Gabriel, Gregory H. Warner, Graybill, Ostrem, Warner & Crotty, Great Falls, Mont., for defendants.

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

RUSSELL E. SMITH, District Judge.

The United States Fidelity & Guaranty Company (USF&G) issued a comprehensive

automobile policy to Earl H. Newman and Ray C. Newman, d/b/a Newman Construction Company, a partnership. Michael Newman, a son of Earl Newman, had an automobile accident on a purely personal trip, while driving a Ford pickup owned by Earl Newman individually. USF&G brought this declaratory judgment action to determine its liability under the policy, joining as defendants all of the persons who would benefit from the establishment of USF&G's liability.

The background of the insurance relationships is this:

In April 1975 Earl Newman acquired a Mercury Cougar automobile which was used by his family and principally by his son Michael. In August 1976 Earl Newman replaced the Cougar with a 1974 Ford pickup which was driven principally by Michael. Earl Newman did not originally or by endorsement list the Cougar on a policy issued in September 1975, and he did not originally or by endorsement list the Ford automobile on an insurance policy issued in September 1976. At no time did he ever pay a premium for the insurance of either car.

The basic question in the case is whether the Ford pickup, which was not specifically listed, is nonetheless covered by the policy.

In my opinion the language of the policy does not embrace the Ford pickup. It cannot be doubted that premiums were charged for each vehicle covered by the policy, and it cannot be doubted that both parties intended that the policyholder would pay a premium for all covered vehicles. The language of the policy is fully consistent with this intent.

In Item 3 of the declarations the policy states:

The insurance afforded is only with respect to such of the following Coverage Parts and Coverages as are indicated by specific premium charge or charges. The limit of the Company's liability against each such Coverage shall be as stated herein, subject to all the terms of this policy having reference thereto.

In the declarations, "Comprehensive Automobile Liability Insurance" is shown to be a "Coverage Part" and one of the coverages is for bodily injury. The declarations then specifically refer to Casualties 75 and 77, endorsements. Casualty 75, as it appears in the policy, is attached hereto as Appendix A. Casualty 77, in two sheets, one describing trucks and the other describing private passenger automobiles, is attached hereto as Appendix B. An inspection of the attached Casualty 75 and Casualty 77 discloses that Casualty 75 is a "Coverage Part" and that the premium basis is per automobile. The list of owned automobiles is furnished by Casualty 77, which is incorporated into Casualty 75. Since, under Item 3 of the declarations, coverage is afforded only as to "Coverage Parts," which are indicated by a specific premium, coverage is excluded as to nonlisted automobiles.

Coverage C, applicable to bodily injury, reads:

The Company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of

C. bodily injury

to which this insurance applies, caused by an occurrence and arising out of the ownership, maintenance or use, including loading and unloading, of any automobile . . . .

Defendants urge that Coverage C for bodily injury affords coverage to nonlisted vehicles because of the use of the words "any automobile." The words "any automobile" must, however, be considered in connection with the words "to which this insurance applies." If those words are considered, then coverage is not afforded because liability does not apply to coverages excluded by Item 3 of the declarations.

Defendants urge that the auditing provisions of the policy, when taken in conjunction with the words "any automobile," create an ambiguity which should be construed

against USF&G. A rubber stamp has been used to stamp across the policy at various places the words "SUBJECT TO AUDIT." The premiums, even for the specific automobiles insured, are described as "advance premiums" and, under the general conditions of the policy, it is stated that a premium deposited as an "advance premium" is a deposit only, subject to adjustment up or down as may be determined at the end of the policy period. The insured promises to pay any difference between the advance premium and the premium earned. USF&G is given the right to audit at the end of the period. It did audit the insured's books and generally confined its audits to payrolls and receipts, but, in any event, there were no changes made on account of automobile liability insurance.

While the insured is required to pay the full earned premium, there is nothing in the policy which obligates the partnership or the individual partners to insure all of their vehicles under the partnership policy. Suppose the partnership owned a specially equipped truck which it knew would not be used in a given year. If it did not want to insure that truck, no provision of the policy would require that it do so or make it liable for a premium. Suppose that one of the Newmans bought a family car and insured it with another company. No provision in the policy would require him to pay a premium on that car at the end of the policy period. As previously stated, the language of the policy, without reference to the advance premiums and auditing provisions, does not insure the Ford pickup.[1] The advance premium and auditing provisions do not create a contract to insure any and every vehicle which Earl Newman might acquire, regardless of some intent on his part to insure and some knowledge on the part of the insurance company of the risk involved.

It is not necessary to decide how or under what circumstances a sufficient intent to be insured could be proved, because here the facts negate any such intent.

While Earl Newman testified in a general way that in his thoughts he and his family were covered in all phases, I specifically find that he did not intend to insure the Ford pickup.

Earl Newman was sufficiently sophisticated to know that insurance companies charged premiums for insuring cars and that the charges were made on a per-automobile basis. He paid no premium on the Mercury Cougar in 1975–76, and no premium on the Ford pickup in 1976–77. He had added other cars to and deleted other cars from his insurance policies, and in fact the policy in question shows that a 1975 Buick was deleted from and a 1977 Oldsmobile was added to "Casualty 77" in the 1976–77 policy. In December 1975 he was advised, by letter addressed to the partnership, as follows:

Enclosed is the above captioned policy to continue your liability for your operations and coverage for the various vehicles as scheduled on the policy. I realize that since I talked to Earl about this way back in August you may have forgotten some of the conversation. Please check to be sure all of the vehicles are covered as you so desire.

He did not then or at any time advise his insurance agent of the Mercury Cougar, which he had had since April 1975. In October of 1976 he was advised by letter as follows:

---

1. The result reached here is apparently contrary to that reached in *State Farm Mutual Automobile Insurance Co. v. American Casualty Co.*, 433 F.2d 1007 (8th Cir. 1970), one judge dissenting; *Indiana Lumbermens Mutual Insurance Co. v. Russell*, 243 La. 189, 142 So.2d 391 (1962), one judge dissenting; and *Murry v. Bankers Fire & Marine Insurance Co.*, 198 So.2d 532 (La.App.1967). *See also Rasmussen v. Western Casualty & Surety Co.*, 15 Utah 2d 333, 393 P.2d 376 (1964), which involves somewhat different facts. While the policy involved in the case of *D'Angelo v. Cornell Paperboard Products Co.*, 59 Wis.2d 46, 207 N.W.2d 846 (1973), does not contain an audit clause, the reasoning in the case is supportive of the reasoning here.

Enclosed is the above captioned policy to continue your liability coverages both for your operations and your vehicles for the coming year ˙ . . . .

.    .    .    .    .

Please review this and if you have any questions do not hesitate to get in touch with us.

He did not then or at any time advise his insurance agent of the Ford pickup, which he had acquired in August 1976. When Michael had the accident, Earl Newman did not report it to the insurance agent, and he never did make a claim against USF&G for the physical damage to the Ford pickup.

In view of all of this, I must believe either that Earl Newman believed he was getting insurance on the Ford pickup free or that he did not intend to insure the Ford pickup. I cannot believe that he expected free insurance, and I am left with the conclusion that Earl Newman did not intend to insure the Ford pickup.[2]

Plaintiff has no liability under the 1976–77 policy. Plaintiff will prepare a judgment accordingly in compliance with Rule 14(b) of the Rules of this Court.

---

2. While of dubious benefit to defendants, a conceivable hypothesis might be that Earl Newman was engaged in a scheme to defraud the insurer and intended to report the Ford pickup only in the event of an accident. However, I do not think that the evidence would warrant such a conclusion.