656 F.2d 457
 UNITED STATES FIDELITY AND GUARANTY COMPANY, A Maryland
Corporation, Plaintiff- Appellee,
v.
Earl E. NEWMAN and Ray C. Newman, d/b/a Newman Construction
Company, et al., Michael David Newman; Harold Hall, Personal
Representative of the Estate of Deborah Hall, deceased;
Harold Hall and Annabelle Hall, Husband and Wife; Timothy
Overbey; Farmers Insurance Group, Inc., d/b/a Farmers
Underwriters Association, Attorney in Fact for Farmers
Insurance Exchange, Defendants-Appellants.
 No. 79-4796.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 7, 1981.
Decided Sept. 14, 1981.
 
 Gregory H. Warner, Robert W. Gabriel, Great Falls, Mont., for defendants-appellants.
 Robert J. Emmons, Smith, Emmons, Baillie & Walsh, Great Falls, Mont., for plaintiff-appellee.
 Appeal from the United States District Court for the District of Montana.
 Before SNEED and BOOCHEVER, Circuit Judges, and ROTHSTEIN,* District Judge.
 BOOCHEVER, Circuit Judge:
 
 
 1
 This is a diversity suit in which United States Fidelity and Guaranty Company (USF&G) seeks a declaration of its rights under an insurance policy issued to Earl and Ray Newman, as a Montana partnership and as individuals. At issue is whether the liability provisions of the policy cover Earl's individually owned vehicle, and not listed on the policy. The automobile was driven by Earl's son, Michael. The district court, 478 F.Supp. 1029, concluded that the policy did not afford coverage for damages stemming from a fatal automobile accident. We conclude that the policy does provide coverage and reverse.
 
 
 2
 The facts are not in dispute. Ray and Earl Newman are partners in a construction company. In September 1976, USF&G issued to the partnership and the two partners individually an insurance policy that included automobile liability coverage. The policy lists several commercial vehicles and two private passenger automobiles.
 
 
 3
 In 1975, Earl Newman purchased a Mercury Cougar for the use of his family. This auto was never listed on previous USF&G policies nor did Newman purchase a separate policy for it. In August 1976, Newman replaced the Cougar with a 1974 Ford pickup. Newman did not request that this vehicle be added to the partnership's policy when the policy was renewed in September 1976, nor did he purchase separate insurance. The pickup was owned by Newman individually, not by the partnership. The district court found that it was principally used by Newman's teenage son, Michael.
 
 
 4
 In April 1977, while the USF&G policy was in effect, Michael Newman was driving the pickup when he was involved in an accident with a car driven by Timothy Overbey. Overbey was injured, his car damaged and Deborah Hall, a passenger in Overbey's car, was killed. Hall's estate and Overbey sued Earl and Michael Newman. USF&G refused to defend and brought this action for a declaratory judgment.
 
 
 5
 In concluding that the policy did not cover the accident, the district court principally relied upon the fact that Newman had neither paid a separate premium to obtain insurance on the Ford pickup nor listed it on the policy. The declarations to the policy state:
 
 
 6
 The insurance afforded is only with respect to the Coverage Parts or Coverages as are indicated by specific premium charge or charges.
 
 
 7
 There is no charge listed for the pickup.
 
 
 8
 The court further found that Newman specifically intended not to insure the pickup, which explained why he never informed USF&G about it. As evidence, the judge noted that Newman had never informed the company about the Mercury Cougar either.
 
 
 9
 Because this is a diversity case, we will follow Montana law in interpreting the insurance agreement. State Farm Mutual Automobile Insurance Co. v. Murnion, 439 F.2d 945, 946-47 (9th Cir.1971) (Montana law). See Wiesmueller v. Interstate Fire & Casualty Co., 568 F.2d 40, 42 (7th Cir.1978); Burton v. State Farm Fire and Casualty Co., 533 F.2d 177, 178-79 (5th Cir.1976).
 
 
 10
 A Montana statute pertaining to contract interpretation provides:
 
 
 11
 When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone if possible ....
 
 
 12
 Mont. Code Ann. § 28-3-303 (1977). Furthermore the Supreme Court of Montana has stated:
 
 
 13
 It is well-settled that the intention of the parties to a contract are not to be inquired into unless on the face of the contract there is ambiguity.
 
 
 14
 Schell v. Peters, 147 Mont. 21, 410 P.2d 152, 155 (1966). In Montana, these principles are just as applicable to insurance agreements as they are to any other contract. Universal Underwriters Insurance Co. v. State Farm Mutual Automobile Insurance Co., 166 Mont. 128, 531 P.2d 668, 673 (1975).[1] Consequently, we are not permitted to examine evidence of Newman's subjective intent to insure the Ford vehicle unless, as a matter of law, an ambiguity exists in the insurance agreement.[2]
 
 
 15
 In interpreting the agreement, our starting point is Casualty 75, which is the portion of the partnership's policy which extends protection against liability for personal injuries. That section contains a premium charge based on a per vehicle basis. A schedule of charges refers to a list of vehicles owned by the partnership and the individual partners. Nevertheless, it is clear that Casualty 75 covers more than just those vehicles listed on the policy.
 
 
 16
 The policy extends liability coverage to "any ... person while using an owned automobile." "Owned automobile" is defined in the policy as an "automobile owned by the Named Insured " and contains no limitation to vehicles listed on the policy. The "named insured" in Casualty 75 is the partnership. The effect of these provisions is to extend liability coverage to the operation of vehicles owned by the partnership, whether listed on the schedule or not.
 
 
 17
 This interpretation of the agreement is confirmed by Mr. Ralphe Merrill, a casualty superintendent for USF&G. He testified that it would take a specific endorsement to remove a commercial vehicle owned by the partnership from the coverage provisions of the partnership policy. The apparent contradiction between this extensive coverage, and the statement in the declarations that coverage only extends to those items for which a premium charge is shown, is explained by the fact that the initial premium paid on the policy is an "advance premium" only. The actual earned premium is determined at the end of the policy period, which in this case would be September 1977. The insurance company retained a right to inspect and audit the insured's "property and operations at any time" to make appropriate adjustments in the earned premium. The only question is whether the coverage of all "owned automobiles" also includes all automobiles owned by the individually named partners. We conclude that it does.
 
 
 18
 The liability protection of Casualty 75 has been extended to the individual partners and their families by an endorsement. The following statement appears at the top of the endorsement:This endorsement modifies such insurance as is afforded by the provisions of the policy relating to Comprehensive Automobile Liability Insurance Automobile Medical Payments Insurance (i. e. casualty 75)
 
 
 19
 After naming Earl and Ray Newman as individual insureds, the endorsement continues:
 
 
 20
 It is agreed that, with respect to an individual named insured, the insurance (Casualty 75) applies subject to the following additional provisions.
 
 
 21
 The remainder of the endorsement does not in any way limit Casualty 75's extension of liability to all "owned automobiles." Although Mr. Merrill stated that it was his belief that Earl Newman would not have had to specifically exclude the Ford pickup from coverage because it was not a commercial vehicle, the fact is, insofar as ownership is concerned, the policy makes no distinction between private and commercial vehicles. We are unable to read into the agreement the unstated condition that the policy was confined to listed vehicles. Consequently, Earl Newman's ownership of the pickup was, by itself, sufficient to bring it within the liability protection of Casualty 75.
 
 
 22
 This interpretation of the agreement is reinforced by contrasting the language of Casualty 75 with other provisions of the policy, in particular, Casualty 85. That provision covers risks related to physical damage to automobiles from such causes as theft or collision. Casualty 85 protects "covered automobiles," which are defined as those "designated in the schedule" and owned or leased by the named insured. As with Casualty 75, an individual named insured endorsement also extends Casualty 85's coverage to the partner's individually owned automobiles. The endorsement further defines an individually "owned automobile" as one "described in the declarations or coverage part schedule" or if not described "newly acquired."
 
 
 23
 The effect of these provisions is to make clear that the Ford pickup is not insured against physical damage. Had USF&G intended to restrict liability coverage in Casualty 75, we believe it would have done so in language like that contained in Casualty 85. Its failure to do so indicates that the company meant to extend liability coverage beyond those automobiles listed at the beginning of the policy period.
 
 
 24
 Finally, USF&G points to a provision contained in the Casualty 75 individual endorsement which it claims defeats coverage:
 
 C. Family Automobile Extensions
 
 25
 If the individual named insured owns during the policy period a private passenger, farm or utility automobile which is maintained or used principally for purposes other than the automobile business:
 
 
 26
 (1) The insurance also applies to a relative, as insured, while using a private passenger automobile (or trailer designed for use therewith) not owned or furnished for the regular use of any relative; provided his actual operation or (if he is not operating) the other actual use of such automobile is with the permission, or is reasonably believed to be with the permission, of the owner and is within the scope of such permission, and provided further such use is not in any business or occupation of the relative.
 
 
 27
 This provision, commonly called a "drive other cars" clause, see 13 G. Couch, Cyclopedia of Insurance Law § 45:1139 (2d ed.1965) extends insurance coverage to include casual driving of automobiles other than those covered by the insurance agreement. USF&G contends that the "regular use" provision in this clause acts to defeat coverage of Michael's use of the pickup because the truck was furnished primarily for his use. We would agree with this argument if it was necessary to rely on this clause to extend insurance coverage, but as discussed, the pickup's use was already covered through Earl Newman's ownership of it. Here the clause is not needed to extend the policy's coverage.
 
 
 28
 Moreover, the clause can not, as USF&G suggests, defeat coverage that has already been provided through other provisions of an insurance agreement. The prohibition against "regular use" is designed to prevent the unlimited extension of "a drive other cars" clause to vehicles which are not otherwise covered. The reason for such a limitation is that an insurance company would ordinarily collect an additional premium for insuring a vehicle that was used regularly, rather than providing such coverage as an incident to other insurance. In this case, the policy entitles USF&G to collect premiums due on any automobiles owned by Newman, including premiums due on the pickup, as part of Newman's regular coverage. USF&G has not cited any cases, and we have found none, where a "drive other cars" clause has limited policy coverages of a vehicle for which an insurance company is entitled to charge a specific premium.[3]
 
 
 29
 The judgment of the district court is therefore REVERSED.
 
 SNEED, Circuit Judge, dissenting:
 
 30
 I respectfully dissent. In my opinion we should affirm for the reasons relied upon by the district court.
 
 
 
 *
 The Honorable Barbara J. Rothstein, United States District Judge for the Western District of Washington, sitting by designation
 
 
 [1]
 The Universal Underwriters case cites § 13-705 (R.C.M. 1947) which was recodified as Mont. Code Ann. § 28-3-303 (1977) cited in the text, supra
 
 
 [2]
 The interpretation of the meaning of the words of a contract and whether an ambiguity exists is a question to be determined in the first instance by the court. McNussen v. Graybeal, 146 Mont. 173, 405 P.2d 447, 454 (1965). The court's conclusion on this question is freely reviewable on appeal because it is a question of law, not fact. See Martin v. United States, 649 F.2d 701, 703 (9th Cir.1981). Where the trial court finds that an ambiguity exists and it is necessary to resolve factual questions as to the parties' intent, the court's findings will be reviewed under the clearly erroneous standard of Fed.R.Civ.P. 52(a). Because, as discussed in the text, infra, we find no ambiguity in the meaning of the contract, we need not consider the trial court's factual findings regarding Newman's intent. Finally, since the district court did not interpret Montana law in reaching its conclusion, there is no interpretation of state law which requires deference. See Tomlin v. Boeing Co., 650 F.2d 1065, at 1067 (9th Cir.1981) (deference granted to district court's interpretation of local law)
 
 
 [3]
 For extensive collections of cases discussing "drive other car" clauses, see Annot., 86 A.L.R.2d 937 (1962); Annot., 173 A.L.R. 901 (1948); 13 G. Couch, Cyclopedia of Insurance Law § 45:1139 (2d ed.1965)