## INSURANCE COMPANY OF ST. LOUIS, Appellant,

v.

## McCONNELL CONSTRUCTION CO., Appellee.

### No. 15008.

Court of Civil Appeals of Texas.

Houston (1st Dist.).

Oct. 5, 1967.

Rehearing Denied Oct. 26, 1967.

Hiram A. Warner, Jr., A. J. Bannon, Houston, for appellant.

Vinson, Elkins, Weems & Searls, John N. Touchstone, Houston, for appellee.

BELL, Chief Justice.

This is an appeal from a judgment in favor of appellee, by which appellee recovered judgment for $4,227.66 as damages allegedly resulting, during construction, to a house being constructed by appellee. Appellee had taken out a "Builder's Risk" policy of insurance with appellant. The policy was in the amount of $35,000.00 and covered a period from October 2, 1959 to April 3, 1960.

From the evidence it appears that the home that was being constructed by appellee for Mr. Fred Wolcott at 6159 Longmont in Houston was damaged as a result of muriatic acid being applied to the brick flooring in the entrance hall, den, breakfast nook, kitchen and utility room. A solution containing the acid was applied so as to clean the floors so the home would be in finished shape to convey and deliver to the owner. It was applied around 9 a. m. on November 26, 1959. The day was cold and rainy. Because of the weather conditions all doors and windows were closed. In addition to the cleaning up, the contractor was touching up spots such as by painting. The deed to the purchaser was signed by Mr. McConnell, for appellee, on November 27 and the secretary signed some time later. The purchaser moved into the house some time on November 27. Either the evening of the 27th or the morning of the 28th the Wolcotts notified Mr. McConnell something was wrong with the house, so he went out to inspect it. When he got inside the house he found the door knobs had all turned a dark color, and the metal light fixtures in the entrance hall had also turned a dark color. In the family room and kitchen that had brick flooring the same was true of the fixtures. Everything in the house that had metal on it was discolored, or tainted, or had pit marks in it that looked like something had been pecking on it. The aluminum windows were pitted and had a white substance on them. The brick flooring had a white substance like fuzz on top of it and the flooring had been discolored.

The use of a solution of 10% muriatic acid and 90% water is a standard method in cleaning buildings. No previous reaction had been experienced when he used this method. In an effort to stop the reaction he hired a firm to wash the flooring with water, which is the correct method to be employed, in order to neutralize the acid. This process was continued for three or four days and finally the tarnishing and discoloration quit. McConnell stated the acid being put on the floor caused the damage.

A list of the materials, such as the metal fixtures, the aluminum windows and the brick flooring that had to be replaced at a cost of $4,227.66, was introduced. The testimony was that this was the reasonable cost in Harris County of the materials that had to be replaced and that such did not enhance the value of the house. The cost of the house was estimated to be $35,000.00 and the amount of the insurance was $35,000.00.

A chemist testified that muriatic acid was a commercial grade of hydrochloric acid and muriatic merely described a particular grade of hydrochloric acid and it was a very aggressive corrosion medium. Too, the salts produced by the acid themselves have a corrosive effect. The fumes or gases produced would also corrode whatever they came in contact with. A hypothetical question was then propounded to the witness encompassing the facts we have related above, and was asked his opinion as to the cause of the damage. He an-

swered that the damage described was very typical of what would be expected from the acid. First, the acid reacts with the mortar in the brick. Basically this is a calcium compound, so that calcium chloride is produced as a by-product and it is very corrosive to metal. Further, carbon dioxide is liberated and this is a wet gas. The "unreacted muriatic acid that comes off in these bubbles that comes of a spray." So just the normal action of the application of the muriatic acid to the floor would tend to spray this material into the air. The damage to the parts of the rooms that did not have brick flooring would be caused by the acid in the air by people walking back and forth. This helps stir up the air and distribute it from one room to another. The natural convection and conduction of current, opening and closing the doors, all help distribute the acid in the air. The damage occurred almost instantaneously. As soon as the acid comes in contact with the metal it takes less than fifteen seconds to damage the metal or these other parts. The damage would have occurred without the heating system being turned on. Because of the porosity of the mortar and brick it is unlikely that the acid could be completely removed. You get seepage back out of the holes, particularly on a wet, humid day. You could not prevent damage to or correct damage to the metal parts. The structure of the metal itself had been attacked. The witness made a test, preparatory to trial, by taking a 10% solution of hydrochloric acid and putting it in a pyrex dish. Above it he suspended a piece of aluminum in an atmosphere where there was no moving air and just let the fumes attack it. This caused severe damage to the metal.

The witness meant that the damage to the physical strength or structure of the metal and brick would occur within fifteen seconds after contact. After the acid was applied to the brick everything takes place. You wouldn't have anything generated the following day. Taking the bricks out and replacing them was the only way to get rid of the gas. The reaction has taken place. The wet gas that carries the acid with it comes off "right now". You then have an atmosphere containing carbon dioxide, calcium chloride and hydrochloric acid. As soon as this atmosphere comes in contact with another surface, whether it be wood, or concrete, or metal, the acid reacts immediately. You then have the by-products of the reaction. Half an hour later, or tomorrow, or next week you have no more reaction other than from just the salts or products of the reaction. It is necessary to remove the flooring because the salts on it are themselves corrosive. In some cases they are more corrosive than the acid. As long as the salts are there they will keep corroding the floor. The brick flooring will continue to put out a corrosive salt and this salt will continue to contaminate the air and get on additional metal products.

The appellant contends that the policy excludes "loss by contamination including loss by any radio-active or fissionable materials." Too, it contends that any physical damage occurred after the home was occupied by the Wolcotts and the policy covers only loss from physical damage occurring during construction and before occupancy in whole or in part.

We are of the view that all the evidence, which we have fully stated above, establishes as a matter of law that the loss shown was due to contamination and came within the exclusion pled by the appellant.

In the case of American Casualty Co. of Reading, Pa. v. Myrick, 304 F.2d 179 (5th Cir.), the court held the loss did not result from ammonia released by an explosion, because there was no explosion. However, it held the release of ammonia from causes other than an explosion caused contamination of the eggs and other products, and that losses caused by contamination were excluded from coverage unless it resulted from an explosion. In the opinion the court defines "contamination" thus: " 'Contamination' connotes a condition of

impurity resulting from mixture or contact with a foreign substance." The trial court in its charge had defined contamination as meaning "a state of being contaminated; an impurity; that which contaminates; to make inferior or impure by mixture; an impairment of purity; loss of purity resulting from mixture or contact." The Court of Appeals approved the definition by stating it was consistent with common understanding and referred to Webster's New International Dictionary.

We have also read the definition given in Webster's New Collegiate Dictionary, The American Illustrated Medical Dictionary, 22nd Edition, and Webster's New International Dictionary, 2nd Edition, and find the definitions of "contaminate" and "contamination" to be in substance the same and consistent with that approved by the Court of Appeals in the above case.

Our holding makes unnecessary the discussion of appellant's other points.

Reversed and rendered.