**AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA, Appellant,**

**v.**

**A. L. MYRICK, d/b/a Market Produce Company, Appellee.**

**No. 18853.**

United States Court of Appeals
Fifth Circuit.

May 17, 1962.

Rehearing Denied June 15, 1962.

J. F. Hulse, George W. Finger, Scott, Hulse, Marshall & Feuille, El Paso, Tex., for appellant.

Daniel Y. Garbern, El Paso, Tex., Robert C. Green, Fort Worth, Tex., Holvey Williams, El Paso, Tex., Collins & Green, Fort Worth, Tex., Calamia & Garbern, El Paso, Tex., for appellee.

Before JONES, BROWN and GEWIN, Circuit Judges.

JONES, *Circuit Judge.*

This is an appeal by American Casualty Company of Reading, Pennsylvania, the defendant in the district court, from a judgment against it in a suit on two insurance policies issued to A. L. Myrick, the plaintiff below and the appellee in this Court. Jurisdiction is based on diversity of citizenship. The appellee Myrick was engaged in the business of processing and distributing poultry, eggs, and similar products under the name of Market Produce Company. For use in his business the appellee maintained leased office space and other facilities in El Paso, Texas. Included among these leased facilities was a large refrigerated storage room in which quantities of chickens, eggs and other products were stored from time to time. The storage room was cooled by means of an ammonia coolant which flowed under pressure through a system of overhead coils. The coil system consisted of twenty-one or twenty-two joined sections of two-inch metal pipe, each approximately forty feet in length, which were suspended from the storage room ceiling by ten three-quarter inch steel turnbuckles and hooks. The coils hung about seven feet above the floor. It appears from the testimony that the coils, plus a six months' accumulation of ice on them, weighed several tons. A one-half inch pipe connected to one end of the coil system supplied the ammonia coolant to the coils, and a suction pipe connected to the opposite end evacuated the ammonia as it accumulated in the coils.

When appellee's business was closed at about 6:30 P.M. on August 1, 1959,

and the door to the storage room locked, the coil system was apparently in proper working order and properly suspended. Julian Pacheco, an employee of appellee's lessor, was responsible for the operation of the refrigeration equipment. Pacheco testified that he arrived at the ice house in which the storage room and office space were located at about 6:00 o'clock on the morning of August 2nd. Shortly after his arrival, Pacheco commenced the process of defrosting the cooling coils. Defrosting the system required increasing the pressure within the coils from its usual operating level of about 20 to 30 pounds to approximately 150 to 175 pounds. Pacheco's first indication that something out of the ordinary was taking place came about thirty minutes after he commenced the defrosting operation. At that time Pacheco saw "a kind of gas" coming from underneath the door to appellee's storage room. Nearing the door, he heard a hissing noise similar to the sound of escaping steam coming from the storage room, but having no key he was unable to enter the storage room and investigate further. Pacheco immediately began to shut off the flow of ammonia to the storage room coils. He then notified appellee's El Paso warehouse manager that something was amiss in the storage room. When the manager arrived, the door was unlocked and opened. Until then no one had seen the interior of the storage room since the door was locked the preceding evening. The entire room was found to be filled with dense clouds of gaseous ammonia. Pacheco testified that they found the coils had fallen to the floor, separating from the half-inch inlet or supply pipe at the point where the coils and the half-inch pipe joined. Ammonia had escaped into the room from the open inlet pipe and from the fallen coils through the opening created by their separation from the inlet pipe and the ruptures at several of the welded joints. The ammonia was so dense that it was not until the following day that the storage room could be entered without a gas mask. Pacheco testified that he did not hear any noise until he heard the hissing sound. Although there is testimony that ordinarily the owner of the building kept a man on duty at night, there is no testimony showing whether or not he was on duty on the night of August 1st–2nd. No one heard or saw the coils fall. All that is known with absolute certainty is that the coils were up one evening and down the next morning.

The free ammonia rendered all of the goods stored in the room unfit for human consumption and, consequently, worthless.

At the time of the loss, appellee's goods were covered by the two insurance policies which are the subject of this suit. Policy IM 505750 provided:

"2. PERILS INSURED AGAINST:

This policy covers all risks of direct physical loss or damage to the insured property from an external cause * * * except as hereinafter excluded.

\* \* \* \* \* \*

"5. PERILS EXCLUDED:

This policy does not insure against loss or damage caused by or resulting from:

a. * * * inherent vice, latent defect, gradual deterioration or depreciation;

b. * * * contamination * * * unless caused by or resulting from loss of or to the property covered by * * * explosion * * *."

Policy No. 42–570629 insured "against direct loss resulting from * * * explosion" and other specified perils.

When appellee presented his claim for the lost goods, appellant denied liability on the ground that the loss did not result from a peril insured against by either policy, and when suit was brought against it, appellant defended on the same ground. The appellee sought to establish the appellant's liability on both policies by taking the position that when the coils fell, separating from the half-inch inlet pipe, the ammonia escaped with

sufficient violence to constitute an explosion. Thus, there would be liability on Policy No. 42–570629 because the loss was a "direct loss resulting from * * * explosion." The appellee asserts that his loss resulted, not from contamination, but rather from an "external cause" of the ammonia gas, with consequent liability under Policy No. IM 505750. At the same time the appellee contends that the policy exclusion of liability for contamination losses would not prevent recovery because the contamination was caused by an explosion. The appellee's theories were submitted to a jury which returned a verdict in his favor.

 In this Court the appellant complains of the denial of his motions for directed verdict and judgment notwithstanding the verdict. Appellant contends that there is no, or at least insufficient, evidence of explosion and that it is conclusively established that appellee's loss was caused by contamination. In consideration of appellant's contentions it should be kept in mind that in reviewing a jury's verdict a court may not substitute its judgment on the facts for the jury's determination simply because inconsistent and uncertain inferences are equally supported by the proof. "The focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury." Tennant v. Peoria & P. U. Ry. Co., 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520. We must determine whether the state of the proof is such that reasonable and impartial minds could reach the conclusion the jury expressed in its verdict. Myers v. Reading Co., 331 U.S. 477, 67 S.Ct. 1334, 91 L.Ed. 1615; Continental Casualty Co. v. Holmes, 5th Cir.1959, 266 F.2d 269; McNamara v. American Motors Corp., 5th Cir.1957, 247 F.2d 445; Marsh v. Illinois Central R. Co., 5th Cir.1949, 175 F.2d 498; Magnolia Petroleum Co. v. N. L. R. B., 5th Cir.1940, 112 F.2d 545; Howard v. Louisiana & A. Ry. Co., 5th Cir.1931, 49 F.2d 571.

The term "explosion" has been defined in various ways and usually in general terms, 25 Tex.Jur.2d 64, Explosions and Explosives § 1; 35 C.J.S. Explosion, p. 243; 22 Am.Jur. 126, Explosions: and Explosives § 2. It has been said to be synonymous with bursting. Bower v. Aetna Ins. Co., N.D.Tex., 54 F.Supp. 897; 12 C.J.S. Bursting, p. 760; see Webster's New International Dictionary, burst. It appears that the Texas courts have not attemped the formulation of an all inclusive and fixed definition of the term "explosion" but rather have sought to give it a meaning in accord with common understanding on a case-to-case basis. Crombie & Co. v. Employers' Fire Ins. Co. of Boston, Mass., Tex.Civ.App., 250 S.W.2d 472. The cases, not involving combustion, which have considered the meaning of the term vary in their factual situations and provide only a general concept of explosion. However, the occurrences which the cases speak of as explosions possess a common characteristic. In each instance, a confined substance suddenly and with varying degrees of violence breaks from its confinement as a result of an internal pressure. Millers Mutual Fire Ins. Co. of Texas v. Schwartz, Tex.Civ.App., 312 S.W.2d 313; Crombie & Co. v. Employers' Fire Ins. Co. of Boston, Mass., supra, Bower v. Aetna Ins. Co., supra. The same circumstance existed in Commercial Union Fire Ins. Co. of New York v. Bank of Georgia, 5th Cir.1952, 197 F.2d 455, and Lever Bros. Co. v. Atlas Assur. Co., 7th Cir., 131 F.2d 770, which were cited by the court in the Schwartz case in holding the evidence sufficient to support a finding of explosion. The common understanding of the term "explosion" includes the notion of a bursting caused by an internal force or pressure. See Webster's New International Dictionary, *explosion, explode, burst*. One definition emphasizes an internal force as the causative element in an explosion:

"The term 'explosion' has been defined as a bursting with violence and loud noise, caused by internal pressure * * *." 22 Am.Jur. 126, Explosions and Explosives § 2.

 In American Alliance Ins. Co. v. Keleket X-Ray Corp., 6th Cir., 248 F.

2d 920, the following definition was approved:

"It [explosion] may be defined as a sudden accidental, violent bursting, breaking, or expansion caused by an internal force or pressure which may be and usually is accompanied by some noise."

Although the cases admit that "explosion" is a term insusceptible of fixed definition, they make it clear that in order for an occurrence to constitute an explosion there must be a sudden breaking forth of a confined substance as a result of an internal force. The evidence is insufficient to support a finding of explosion. There is no proof that pressure within the coils was or probably was a cause of the escape of the ammonia from the coils. Appellee points to the testimony of four witnesses as supporting a finding of explosion. Three of the four were asked hypothetically what would happen if the coils, charged with high pressure, were to fall to the floor breaking away from the inlet pipe. The answers were that the ammonia would "come out at a very high velocity, with an expansion," "would burst out," or "would expand with a rush." Such testimony may tend to establish that when released the pressure within the coils dissipated rapidly, but it does not provide a basis for inferring that the pressure within the coils was a cause of the break through which the ammonia escaped. The fourth witness, Pacheco, gave his opinion that the pressure within the coils or a combination of internal pressure and vibration "could have" or "probably could have" caused the inlet pipe to "pop or burst." At most, Pacheco expressed an opinion as to only

a possibility, and upon cross-examination he apparently retreated from the opinion expressed by saying that the falling of the coils simply broke the inlet pipe.[1] There must be a reasonable basis for a verdict. Surmise and speculation are inadequate. Montgomery-Ward & Co. v. Sewell, 5th Cir.1953, 205 F.2d 463. There is no liability on Policy No. 42–570629.

■■■ The appellant also urges that, as a matter of law, there can be no recovery on Policy No. IM 505750 because the appellee's loss resulted from contamination which was one of the excluded perils. "Contamination" connotes a condition of impurity resulting from mixture or contact with a foreign substance.[2] In its charge, the trial court defined the term as meaning the " * * * state of being contaminated; an impurity; that which contaminates; to make inferior or impure by mixture; an impairment of purity; loss of purity resulting from mixture or contact." This definition is consistent with common understanding, see Webster's New International Dictionary, *contamination, contaminate,* which is the proper criterion for construing words in an insurance policy. Hall v. Great National Lloyds, 154 Tex. 200, 275 S.W.2d 88; Continental Casualty Co. v. Warren, 152 Tex. 164, 254 S.W.2d 762. Upon trial a chemist testified that when ammonia comes in contact with goods such as those the appellee had in the storage room, the ammonia and the water in the goods chemically react to form ammonia hydroxide, a caustic substance which is highly dangerous if consumed. Appellee does not contend that his goods were not contaminated but rather argues that on the

---

1. "Q. And the place where these refrigeration pipes had broken away from the lead-in pipe, that is where the break was, wasn't it?

"A. Yes.

"Q. It wasn't at the other end where the suction pipe fits in, was it?

"A. No. In other words, it was just— in other words, there was one flange out there as it comes out that was kind of twisted open for the same reason that

the weight of those coils, it opened up the flange there, in other words.

"Q. Well, in other words, when you have this flange pipe, and the coils fell down, they simply broke it? (Indicating)

"A. That is right."

2. It is unnecessary to consider whether "contamination," as the term is used in this policy, would include a condition resulting from putrefaction.

evidence the jury, as instructed, could have found that the free ammonia, an "external cause," and not "contamination," was the proximate cause of his loss. Paragraph 2 of the policy in question provides coverage against loss from "any external cause * * * except as herein excluded." Paragraph 5 excludes losses caused by or resulting from contamination unless the contamination is the result of explosion or certain other perils not here relevant. These two provisions, read together, clearly show that there is no liability on the policy for losses resulting from contamination except in the specified circumstances, none of which are present in this instance. Nevertheless, the appellee argues that the result on these facts is the same as if the contamination exception were not in the contract because an "external cause" produced the contamination by reason of which his loss was sustained. A contract of insurance as any other contract must be read as a whole and, where possible, effect given to the entire contract. Pan American Life Insurance Co. v. Andrews, 161 Tex. 391, 340 S.W. 2d 787; United American Insurance Co. v. Selby, 161 Tex. 162, 338 S.W.2d 160; G. A. Stowers Furniture Co. v. American Indemnity Co., Tex.Com.App., 15 S.W.2d 544; 32 Tex.Jur.2d 102, Insurance § 54. The purpose of an exception is to take something out of the contract which otherwise would have been included in it. Reliance Ins. Co. v. Naman, 118 Tex. 21, 6 S.W.2d 743; Maryland Casualty Co. v. Texas Fireproof Storage Co., Tex. Civ.App., 69 S.W.2d 826. The cause of the appellee's loss was the contamination of the goods by the contact of the ammonia gas, which was, it may be said, a cause external to the goods, but nevertheless the result was contamination and excluded from coverage unless caused by or resulting from an explosion. We cannot rewrite the policy. General American Indemnity Co. v. Pepper, 161 Tex. 263, 339 S.W.2d 660; Home Ins. Co., New York v. Rose, 152 Tex. 222, 255 S.W. 2d 861; United States Fidelity & Guaranty Co. v. Baldwin Motor Co., Tex.Com.

App., 34 S.W.2d 815; United American Ins. Co. v. Pittillo, Tex.Civ.App., 308 S.W.2d 241; 32 Tex.Jur.2d 102, Insurance § 54. There is no ambiguity in the relevant provisions. Where the parties intend that a particular peril be excluded and that intent is clearly expressed, effect should be given to the exclusion. Maryland Casualty Co. v. Texas Fireproof Storage Co., supra; 32 Tex. Jur.2d 119, Insurance § 59; 1 Couch, Insurance 2d 835, § 15:92. To say that there was an external cause which was the proximate cause of the loss does not eliminate the exclusion from the contract. Since the evidence establishes that the appellee's goods were contaminated, the exclusion in the policy must be given effect.

Judgment should have been rendered for the appellant, and the case is reversed and remanded so that this may be done. Reversed and remanded.