**ENRON OIL TRADING & TRANS-
PORTATION COMPANY,
Plaintiff,**

v.

**UNDERWRITERS OF LLOYD'S OF LONDON Under Policy # 552/020129100; Sedgwick North America Limited; Employers Insurance Company of Wausau; Evanston Insurance Company; et al., Defendants.**

No. CV–90–122–GF.

United States District Court,
D. Montana.

April 16, 1996.

Jean E. Faure, Glenn E. Tremper, Church, Harris, Johnson & Williams, Great Falls, MT, for EOTT Energy Operating Limited Partnership, plaintiff.

Kirk D. Evenson, Marra, Wenz, Johnson & Hopkins, PC, Great Falls, MT, for Ludgate Insurance Company, Limited, defendant.

Gregory J. Hatley, Davis, Hatley, Haffeman & Tighe, PC, Great Falls, MT, Robert M. Wattson, Zelle & Larson, Minneapolis, MN, for Employers Insurance Company of Wausau, defendant.

J. Michael Young, Ugrin, Alexander, Zadick & Higgins, PC, Great Falls, MT, Patrick R. Watt, Jardine, Stephenson, Blewett & Weaver, PC, Great Falls, MT, for EOTT Energy Operating Limited Partnership, counter-defendant.

William P. Conklin, Conklin, NYBO, LeVeque & Murphy, PC, J. Eric Elliff, Morrison & Foerster, Denver, CO, for Travelers Indemnity Company, defendant.

Steven R. Smith, Mike Satz, McCullough, Campbell & Lane, Chicago, IL, for Zurich Insurance Company, counter-claimant.

### MEMORANDUM AND ORDER

HATFIELD, Senior District Judge.

Plaintiff, Enron Oil Trading & Transportation Company ("Enron"), instituted the above-entitled action seeking, *inter alia*, a declaratory judgment regarding the scope of coverage under "non-marine" manuscript policies of excess insurance which were placed domestically and with the London insurance market. Enron's complaint also seeks compensatory and punitive damages from the named defendants ("excess insurers") under the following

claims for relief: breach of contract, negligence and violation of Montana's Unfair Trade Practices Act, Mont.Code Ann. §§ 33–18–201 *et seq.* (1991).[1] Presently before the court are the following motions: (1) the excess insurers' motion for judgment on the pleadings; and (2) Enron's motion for partial summary judgment, pursuant to Fed.R.Civ.P. 56. The issue dispositive of the parties' respective motions is whether or not the uncontradicted facts of record establish the excess insurers breached their duty, under the insurance agreements at issue, to indemnify Enron with respect to the costs incurred in litigating and ultimately settling a civil lawsuit instituted by Ashland Oil, Inc. ("Ashland"), *Ashland Oil, Inc. v. Enron Oil Trading & Transportation Co., and Portal Pipeline Co.,* cause No. CV–84–197–GF ("Ashland action"). Having reviewed the record herein, together with the parties' briefs in support of their respective positions, the court is prepared to rule.

## BACKGROUND

Ashland owned and operated an oil refinery in St. Paul, Minnesota, which utilized crude oil shipped via a pipeline operated by Portal Pipeline Co. ("Portal").[2] In 1982, Ashland began experiencing problems at its refinery. After conducting an internal investigation, Ashland determined there was something wrong with the common stream of crude oil the refinery was receiving from the Portal pipeline. Ashland eventually determined Portal was allowing Enron and other shippers to inject a volatile high vapor pressure butane gas, hereinafter referred to as "B–G mix"[3], into the pipeline, thereby altering the common stream of crude oil.

In August, 1984, Ashland instituted the underlying action, seeking compensatory and punitive damages under a wide range of theories of liability, including breach of contract, breach of express and implied warranties, breach of tariff, strict liability, negligence, fraud, constructive fraud and conspiracy.

### 1. Ashland's Complaint

Ashland's complaint in the underlying action alleged, *inter alia,* that Enron, as well as other defendants, fraudulently conspired to, and in fact did, inject B–G mix, a commodity of significantly lesser value, into the crude oil common stream of the Portal Pipeline. Ashland's complaint further alleged Enron's actions violated the Portal tariff, a contract which strictly governed the handling and operation of the crude oil pipeline[4], and resulted in various economic damages, as well as property damage to Ashland's refinery.

Of pertinence to the present action are the following paragraphs taken directly from Ashland's third amended complaint:

20. In early November 1981, Portal agreed to permit UPG [the predecessor entity to Enron Oil] to inject B–G mix into the Portal Pipeline and agreed that it would not invoke any of the tariff provisions, including Item

---

1. Enron initiated the above-entitled action in the District Court of the Eighth Judicial District of the State of Montana. Defendant Insurance Corporation of Ireland Limited subsequently removed the action to this court by filing a notice of removal, pursuant to 28 U.S.C. § 1441(d), in conjunction with 28 U.S.C. § 1446(b).

2. Portal's pipeline stretches from Reserve, Montana, to Clearbrook, Minnesota, and serves as a conduit for transporting petroleum from fields in eastern Montana and North Dakota to downstream refineries. Petroleum is transported through the pipeline in a "common stream", meaning the petroleum, once placed into the pipeline, is commingled and mixed with the other petroleum being shipped through the pipeline.

3. Ashland's complaint defined "B–G mix" as "tariff-nonconforming high vapor pressure materials, including butane-natural gasoline mix, and other contaminants."

4. As a "carrier" under federal law, Portal's rates and procedures are governed by a tariff agreement filed with the Federal Energy Regulatory Commission. The tariff sets out the rules and regulations which shippers must follow in transporting petroleum through the pipeline.

25(a), as a basis for rejecting such materials for transportation.

21. Portal's agreement with UPG [Enron] contemplated that the B–G mix would be placed in the North Dakota Sweet Stream rather than the North Dakota Sour Stream,[5] because the North Dakota Sweet crude oil with which the B–G mix would be commingled was more valuable than the North Dakota Sour crude oil carried in ·the North Dakota Sour Stream.

22. The aforesaid agreement between Portal and UPG [Enron] also contemplated that the B–G mix would be marketed as North Dakota Sweet crude oil so that substantial profits could be reaped by charging the applicable posted price for North Dakota Sweet crude oil (plus in many cases a large premium) rather than the much lower market price for B–G mix.

\* \* \* \* \* \*

25. Having secured Portal's agreement to accept the tariff-nonconforming B–G mix, in late November 1981, UPG [Enron] began injecting substantial volumes of B–G mix into the North Dakota Sweet Stream at the request of and for the account of Conoco, Inc. ("Conoco"), which in turn transferred those materials to Ashland pursuant to (and in violation of) a crude oil exchange agreement. At all time, UPG [Enron] was aware that the crude oil exchange agreement called for the delivery of North Dakota Sweet crude oil and that Ashland was instead receiving B–G mix in violation of that agreement.

26. Recognizing the tremendous profitability of marketing B–G mix as crude oil, in December 1981, UPG [Enron] met with Portal to explore the possibility of increasing deliveries of B–G

mix and establishing additional injection sites. At that meeting, Portal agreed to allow UPG [Enron] to inject a total of 4,000 BPD of B–G mix into the line and recommended Reserve, Montana, as the injection site. At UPG's [Enron's] request, Portal identified Ashland as a potential customer for such tariff-nonconforming materials.

27. Subsequently, in or about May 1982, Portal agreed (a) to permit UPG [Enron] to inject into the North Dakota Sweet Stream approximately 1,000 to 2,000 BPD of B–G mix and North Dakota Sweet crude oil, and (b) to lease to UPG [Enron] a tract of land near Reserve, Montana, to serve as the injection site for such materials. This agreement contemplated that most of the material injected by UPG [Enron] at Reserve, Montana, would consist of B–G mix.

\* \* \* \* \* \*

30. The UPG [Enron] representatives who negotiated the Reserve Contract understood that it called for the delivery of North Dakota Sweet crude oil, and not B–G mix. Nevertheless, UPG [Enron] intended at the outset to violate the Reserve Contract by delivering to Ashland substantial volumes of B–G mix that neither conformed to the applicable Portal tariff nor qualified as North Dakota Sweet crude oil.

31. To lull Ashland into a false sense of security, during the first two months of the Reserve Contract (*i.e.*, September and October 1982), UPG [Enron] delivered only North Dakota Sweet crude oil into the pipeline for Ashland's account.

32. However, beginning from November 1982 until March 1984, UPG [En-

5. Throughout the time period in question, Portal transported two separate streams of crude oil. Beginning in February, 1982, Portal transported crude oil whose sulphur content was less than 0.5 percent, *i.e.*, North Dakota Sweet crude oil, in the North Dakota Sweet Stream and crude oil with higher sul-phur content, *i.e.*, North Dakota Sour crude oil, in the North Dakota Sour Stream. Prior to February, 1982, Portal batched crude oil according to its gravity (rather than its sulphur content), and identified the two streams as the North Dakota Light Stream and the North Dakota Intermediate Stream.

ron] breached the Reserve Contract by injecting substantial volumes of B–G mix in lieu of the North Dakota Sweet crude oil expressly called for in the Reserve Contract. UPG [Enron] falsely represented that those shipments contained only tariff-conforming North Dakota Sweet crude oil.

33. As contemplated by the aforesaid agreement between Portal and UPG [Enron], during the period from November 1981 through March 1984, UPG [Enron] injected into the North Dakota Sweet Stream substantial volumes of B–G mix for the accounts of shippers/consignees other than Ashland. Often, UPG [Enron] tendered those volumes of B–G mix pursuant to (and in violation of) contractual arrangements which called for the delivery of North Dakota Sweet crude oil.

34. At all times, each of the defendants knew the true nature and quality of the B–G mix introduced into the Portal Pipeline. In injecting and/or transporting said B–G mix in the pipeline, each of the defendants knowingly violated the applicable Portal tariffs. From March 1980 through March 1984, Portal accepted from UPG [Enron] and others in excess of 2,900,000 barrels of B–G mix.

\* \* \* \* \* \*

46. Ashland's St. Paul Park Refinery cannot process without severe disruptions to its refinery operations crude oil contaminated with substantial quantities of B–G mix. Consequently, in attempting to refine the aforesaid contaminated shipments, Ashland not only lost the benefit of its bargain, but also incurred serious losses and damages, including loss of production, loss of profits, expenses incurred in correcting the contamination and ensuing consequences, and damages to its refinery and its oil.

47. As soon as Ashland experienced abnormally high vapor pressure levels at its St. Paul Park Refinery, Ashland immediately commenced a comprehensive investigation to ascertain the cause of this problem.

48. Despite the diligent and thorough manner in which this investigation was conducted, Ashland did not discover the B–G mix injections until early 1984.

49. Ashland did not uncover defendants' fraudulent scheme any earlier because of defendants' conspiracy to conceal their misconduct from Ashland and other Portal Pipeline shippers/consignees.

50. Defendants' fraudulent efforts to conceal their misconduct from Ashland include but are not limited to the following:

a. Defendants falsely represented to Ashland the true nature and quality of the B–G mix injected for Ashland's account.

b. On several occasions, representatives of the defendants refused to acknowledge and/or denied the existence of the B–G mix injections even when Ashland personnel (and other individuals acting on Ashland's behalf) specifically inquired as to the possible causes of the high vapor pressure of the North Dakota Sweet Stream.

c. Defendants' invoices to Ashland falsely identified the invoiced shipments containing B–G mix as crude oil or North Dakota Sweet crude oil. In addition, UPG's [Enron's] and Conoco's invoices and Portal's allowance oil invoices charged Ashland the applicable posted price for North Dakota Sweet crude oil (plus in some cases a premium) rather than the much lower market price for B–G mix.

d. The defendants masked the assessment of Item 45's high gravity penalty against the shipments of B–G mix made by UPG [Enron] and others for Ashland's account. Had it known that this penalty was being assessed, Ashland might well have discovered the defendants' practice of transporting B–G mix, because the

gravity of North Dakota Sweet crude oil is much too low to trigger this penalty. To prevent Ashland from making such a discovery, UPG [Enron] absorbed those penalties by serving as the shipper of record and/or by billing Ashland only for the net volume ultimately delivered by Portal, and Portal intentionally misrepresented those penalties on Ashland's metered receipts/delivery tickets as deductions for excess basic sediment and water.

e. To preclude Ashland and other shippers/consignees from detecting the presence of B–G mix in the common stream, the defendants attempted to thoroughly commingle the B–G mix with the crude oil already in the line by, among other things, injecting the B–G mix ratably into the pipeline.

51. Once Ashland discovered defendants' fraudulent practice of transporting B–G mix in the Portal Pipeline, it promptly demanded that defendants immediately discontinue that practice.

52. Only upon being confronted by Ashland did any of the defendants admit responsibility for injecting and/or transporting substantial volumes of B–G mix in the Portal Pipeline.

6. After learning Enron injected B–G mix into the pipeline's common stream, Ashland withheld payment on invoices seeking $1,760,-718.63 for deliveries made in early 1984, as a set-off for damages it purportedly sustained to the value of the crude oil and its refinery.

7. Throughout the relevant time period, Travelers Indemnity Company ("Travelers") provided Enron certain insurance coverage, including a policy of primary insurance with provisions for the defense and indemnity of certain liability claims. Accordingly, the excess insurers were under no duty to provide a defense to Enron with respect to the claims advanced by Ashland in the underlying action. The assistance and cooperation clause of subject excess insurance policy provides:

## 2. Resolution of Ashland Action

After four years of contested litigation, the Ashland action ultimately settled, prior to trial, when Enron agreed to (1) pay Ashland the sum of 3.225 million dollars ($3,225,000); and (2) forego a counterclaim seeking an award of damages in the approximate amount of 1.7 million dollars ($1,700,000).[6] None of the excess insurers contributed to the settlement of the Ashland action, or otherwise indemnified Enron.[7]

## 3. Present Action

On August 20, 1990, Enron instituted the above-entitled action seeking, *inter alia,* to recover the funds it expended in litigating and settling the Ashland action. Specifically, Enron maintains that in effecting a settlement of the Ashland action, it settled a property damage claim that falls within the scope of coverage afforded by the defendants' manuscript policies of excess insurance. In addition, Enron advances numerous affirmative claims for relief predicated upon the excess insurers' handling of the underlying claim.

In response, the excess insurers contend the costs Enron incurred in the Ashland action do not fall within the indemnity coverage afforded by the subject manuscript policies of excess insurance. In support of their position, the excess insurers advance two alternate arguments. First, the excess insurers maintain the allega-

ASSISTANCE AND CO-OPERATION

Underwriters shall not be called upon to assume charge of the settlement or defense of any claim made or suit brought or proceeding instituted against the Insured but Underwriters shall have the right and shall be given the opportunity to associate, with the Insured or the Insured's underlying Insurers or both, in the defense and control of any claim, suit or proceeding relative to an occurrence where the claim or suit involves or appears reasonably likely to involve Underwriters in which event the Insured, the Underlying Insurers and Underwriters shall cooperate in all things in the defense of such claim, suit or proceeding.

tions of "contamination" advanced in Ashland's underlying complaint preclude coverage in light of the policy's "pollution exclusion." Second, the excess insurers contend Enron should be precluded, as a matter of public policy, from receiving indemnification for conduct which the excess insurers characterize as "intentional tortious" activity, resulting from a calculated business decision.

Analysis of the parties' respective positions must necessarily begin with a review of the unique insurance arrangement and the manuscript excess indemnity policies to which the excess insurers subscribed.

## MANUSCRIPT EXCESS POLICIES

From June 1, 1981 through June 1, 1984, Enron was insured pursuant to a sophisticated program of insurance arranged in multiple layers of excess insurance, depending upon the size of the covered loss. Insurers who participated in the first layer of coverage agreed to pay, on a joint basis, up to $1 million for any covered loss exceeding a $250,000 self-insured retention. Insurers who subscribed to the second layer of coverage jointly agreed to pay, in various percentages, $4 million for any covered loss not fully paid by the first layer's coverage (or that which exceed $1 million). Several other layers were arranged so as to provide Enron with more than $100 million in coverage.[8]

The insurers who participated in the first layer of coverage issued a manuscript excess policy which defined the coverage provided, as well as the terms and conditions of the insurers' obligations. That policy served as the "governing policy" for all subsequent layers of coverage. Each insurer that participated in subsequent layers of coverage executed an endorsement adopting the terms and conditions of the governing policy as the terms and conditions of its own agreement with Enron.

Although Enron's excess insurance program is a complicated arrangement amongst a number of participating insurers, the court, for purposes of the present motions, need only consider certain provisions of the governing policy pertaining to coverage. Section III of the governing policy, which provides coverage for "Third Party Personal Injury and Personal Property Damage," states as follows:

> To pay on behalf of the Insured, all sums which the Insured shall be obligated to pay to any person or persons, including employees of the Insured, by reason of the Liability imposed upon the Insured by law, or in respect only of operations by or on behalf of the Named Insured assumed by the Insured under contract or agreement for damages, direct or consequential, and expenses, all as more fully defined by the term "Ultimate Net Loss" [9] on account of personal injuries and/or bodily injuries and/or occupational disease including death at any time resulting therefrom, and/or damage to or destruction or loss of use of the property of others.

The governing policy also contained the following limitation on coverage:

> *INDUSTRIES, SEEPAGE, POLLUTION AND CONTAMINATION CLAUSE*

8. Individual insurers, both domestic and in the London insurance market, agreed to participate in any given layer by agreeing to share in some percentage of the total coverage provided by the layer. The insurer also agreed to some period of coverage falling within the three year term of the governing policy.

9. The term "Ultimate Net Loss" is defined as: [T]he total sum which the Insured or any company as his insurer, becomes obligated to pay by reason of personal injury or property damage claims, either through adjudi-

cation or compromise, and shall also include hospital, medical and funeral charges and all sums paid as salaries, wages, compensation, fees, charges and law costs, premiums on attachment or appeal bonds, interest, expenses for doctors, lawyers, nurses and investigators and other persons, and for litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder, excluding only the salaries of the Named Insured's or any underlying Insurer's permanent employees.

This insurance does not cover any liability for:

(1) Personal Injury or Bodily Injury or loss of, damage to, or loss of use of property directly or indirectly caused by seepage, pollution or contamination, provided always that this Paragraph (1) shall not apply to liability for Personal Injury or Bodily Injury or loss of or physical damage to or destruction of tangible property, or loss of use of such property damaged or destroyed, where such seepage, pollution or contamination is caused by a sudden, unintended and unexpected happening during the period of this insurance.

(2) The cost of removing, nullifying or cleaning-up seeping polluting or contaminating substances unless the seepage pollution or contamination is caused by a sudden, unintended and unexpected happening during the period of this insurance.

(3) Fines, penalties, punitive or exemplary damages.

This Clause shall not extend this Insurance to cover any Liability which would not have been covered under this Insurance had this Clause not been attached.

### DISCUSSION

#### I.

■■■ The determination of whether the allegations of a complaint assert facts which represent a risk potentially covered by the terms of an insurance contract, necessarily calls upon the court to construe the terms of the insurance contract. Construction of insurance contracts in Montana[10] is, of course, governed by the general law of contract interpretation contained in Title 28, Chapter 3, Montana Code Annotated, and the case law which has developed thereunder in the context of insurance. *Page Wellcome Professional Service v. Home Ins. Co.,* 758 F.Supp. 1375, 1379 (D.Mont.1991). Consequently, absent an ambiguity, the language of an

insurance contract governs its interpretation. *See, Schell v. Peters,* 147 Mont. 21, 410 P.2d 152, 155 (1966); Mont.Code Ann. § 28–3–401 (1993). The interpretation of the language of a contract and whether an ambiguity exists is a question of law for the court to determine in the first instance. *See, Dagel v. Farmers Ins. Group,* 903 P.2d 1359, 52 St.Rptr. 1023, 1024 (1995); *Schell, supra,* 410 P.2d at 155; *United States Fidelity & Guaranty Co. v. Newman,* 656 F.2d 457, 459 (9th Cir.1981).

■■■ In assessing whether an ambiguity exists in an insurance contract, the court remains mindful of two well-established principles to be followed in interpreting an insurance contract. First, the terms are to be interpreted according to what a "reasonable person in the position of an insured would understand them to mean." *St. Paul Fire & Marine Ins. Co. v. Thompson,* 150 Mont. 182, 433 P.2d 795, 799 (1967). Restated, the determination of whether an ambiguity exists in an insurance policy requires an examination of the language utilized from the viewpoint of a consumer of average intelligence, not trained in the law or in the insurance business. *See, e.g., Whispering Creek Condominium Owner Assoc. v. Alaska National Ins. Co.,* 774 P.2d 176 (Alaska 1989); *Sparks v. Republic National Ins. Co.,* 132 Ariz. 529, 647 P.2d 1127 (1982), *cert. denied,* 459 U.S. 1070, 103 S.Ct. 490, 74 L.Ed.2d 632 (1982). Second, "exclusions and words of limitation in a policy must be strictly construed against the insurer regardless of whether or not they are ambiguous." *Aetna Ins. Co. v. Cameron,* 194 Mont. 219, 633 P.2d 1212, 1214 (1981); *see also, Farmers Union Mutual Ins. Co. v. Oakland,* 251 Mont. 352, 825 P.2d 554, 556 (1992).

#### II.

■■■ It is well settled that "[t]he duty to indemnify is not necessarily coextensive

---

**10.** The parties concur that the law of Montana controls the substantive issues of law presented by this controversy. *See, Erie Railway Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

with the duty to defend." *Standard Fire Insurance Co. v. Peoples Church of Fresno*, 985 F.2d 446, 450 (9th Cir.1993). On the contrary, an insurer's duty to defend is "conceptually distinct from and legally independent of its duty to indemnify, that is, its obligation to pay a judgment." *Sherman v. Ambassador Insurance Co.*, 670 F.2d 251, 258–59 (D.C.Cir.1981). Indemnification under an insurance policy is not due unless the insured actually loses on, or is made liable for, claims that fall within the coverage provided by the policy. *Id.* at 259. While an insurer must defend its insured if the complaint alleges conduct that *potentially* falls within the scope of the policy, it must indemnify its insured only if liability is found for conduct that *actually* falls within the scope of coverage. *Winner Intern. Corp. v. Continental Cas. Co.*, 889 F.Supp. 809, 816 (W.D.Pa.1994), *citing, Allstate Ins. Co. v. Brown*, 834 F.Supp. 854, 857 (E.D.Pa.1993).

 Consequently, an insurer's duty to indemnify is determined by the facts, which are usually established at trial. *American Motorists Insurance Co. v. General Host Corporation*, 946 F.2d 1482, 1488 (10th Cir.1991). Where an action settles prior to trial, however, the duty to indemnify must be determined on the basis of the settlement, *i.e.*, the undisputed facts set forth in the underlying complaint and those known to the parties. *See, Travelers Insurance Co. v. Waltham Industrial Laboratories Corp.*, 883 F.2d 1092, 1099 (1st Cir.1989); *American Home Assur. Co. v. Dykema, Gossett, et al.*, 811 F.2d 1077, 1083 (7th Cir.1987).[11]

In the case *sub judice*, the terms of the Ashland settlement have not been made a part of the record. Nevertheless, Enron has not alleged the settlement involved matters outside those raised by Ashland's complaint. On the contrary, Enron's complaint expressly seeks indemnification for all sums expended in settling the Ashland action. Nothing in Enron's complaint gives rise to an inference that any of the sums paid to or credited Ashland in the underlying action involved occurrences or claims other than those alleged in Ashland's complaint. Accordingly, this court must examine the claims advanced in Ashland's complaint in light of the coverage afforded by the governing policy.

## III.

### A. *Pollution Exclusion*

In moving for judgment on the pleadings,[12] the excess insurers contend the allegations advanced in Ashland's complaint preclude coverage for Enron's claims. The position advocated by the excess insurers is premised upon their conclusion that coverage is defeated by the governing policy's "pollution" exclusion, which provides:

---

11. Enron maintains it is entitled to partial summary judgment because it purportedly developed facts in the underlying litigation which potentially would have brought Ashland's claim within the indemnity coverage of the governing policy. Accordingly, based upon that potential coverage, Enron maintains the settlement of the Ashland action necessarily obligates the excess insurer' to provide indemnification. Enron has failed to advance a persuasive argument, supported by recognized authority, in support of its position. Moreover, Enron has failed to articulate, with any specificity, the purported facts which establish its right to indemnification.

12. Judgment on the pleadings is proper when there are no issues of material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 12(c); *General Conference Corp. v. Seventh–Day Adventist Congregational Church*, 887 F.2d 228, 230 (9th Cir.1989), *cert. denied*, 493 U.S. 1079, 110 S.Ct. 1134, 107 L.Ed.2d 1039 (1990). A Rule 12(c) motion may be granted where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings. *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2nd Cir.1988), *citing, National Fidelity Life Ins. Co. v. Karaganis*, 811 F.2d 357, 358 (7th Cir.1987). Although a court must view the facts in the light most favorable to the nonmoving party, it is not bound by that party's legal characterizations of the facts. *Karaganis*, 811 F.2d at 358, *citing, Republic Steel Corp. v. Pennsylvania Engineering Corp.*, 785 F.2d 174, 177 n. 2 (7th Cir.1986).

This insurance does not cover any liability for ... Personal Injury or Bodily Injury or loss of, damage to, or loss of use of property directly or indirectly caused by seepage, pollution or contamination ...

Consequently, the determinative issue reduces to whether the damages alleged in the Ashland action were "directly or indirectly caused by ... 'contamination'" and, therefore, fall within the policy exclusion. The excess insurers have consistently maintained that the claims advanced in the Ashland action were predicated upon Enron's injection of B–G mix into the Portal Pipeline. The excess insurers maintain the B–G mix contaminated the crude oil feedstock and resulted in economic damages to Ashland, as well as property damage to its refinery.

Enron, as might be expected, takes quite a different view regarding the construction to be afforded the term "contamination" as used in the subject policy. Enron's challenge to the argument advanced by the excess insurers is three-pronged in nature. First, Enron maintains the B–G mix did not "contaminate" the crude oil feedstock because B–G mix is not a "foreign substance" with respect to an oil pipeline. Second, Enron asserts the pollution exclusion necessarily contemplates injury to the environment and, as a result, any purported damage to the crude oil common stream would not fall within the scope of the policy exclusion. Third, Enron implores the court to recognize the pollution exclusion is ambiguous and, consequently, must be construed against the excess insurers.

In *Duensing v. Traveler's Companies*, 257 Mont. 376, 849 P.2d 203, 207 (1993),[13] the Montana Supreme Court held the plain, ordinary meaning and understanding of "contamination" requires the actual presence of a "foreign substance." In so holding, the court explicitly relied upon the rationale expressed in *American Cas. Co. of Reading, Penn. v. Myrick*, 304 F.2d 179, 183 (5th Cir.1962); *Auten v. Employers Nat. Ins. Co.*, 722 S.W.2d 468 (Tex.App. 1986); and *Hi–G, Inc. v. St. Paul Fire & Marine Ins. Co.*, 391 F.2d 924 (1st Cir. 1968). *Duensing, supra*, 849 P.2d at 206–07.

In *American Cas. Co. of Reading, Penn. v. Myrick*, 304 F.2d 179, 183 (5th Cir.1962), the Fifth Circuit Court of Appeals held:

"Contamination" connotes a condition of impurity resulting from mixture or contact with a foreign substance. In its charge, the trial court defined the term as meaning the "... state of being contaminated; an impurity; that which contaminates; to make inferior or impure by mixture; an impairment of purity; loss of purity resulting from mixture or contact." This definition is consistent with common understanding, *see*, Webster's New International Dictionary, *contamination, contaminate*, which is the proper criterion for construing words in an insurance policy.

*Myrick, supra*, 304 F.2d at 183.

In *Auten v. Employers Nat. Ins. Co.*, 722 S.W.2d 468, 469 (Tex.App.1986), the court held " 'contamination' occurs when a condition of impairment or impurity results from mixture or contact with a foreign substance." The court noted "the word 'foreign' is synonymous with 'inap-

13. In *Duensing*, the owners of a Helena confectionery store discovered a worker had been exposed to Hepatitis A. After administrative action by various health agencies, the owners voluntarily destroyed their existing inventory of candy. Thereafter, the owners tendered a first party property loss claim to their insurer, who ultimately denied coverage on the basis of the following exclusion:

2. We will not pay for loss or damage caused by or resulting from any of the following: ...

d. ... (7) The following causes of losses to personal property: ...
(d) Evaporation, loss of weight, contamination, exposure to light or change in flavor, color, texture or finish.

The court ultimately concluded the owners' inventory was only "suspected" of being contaminated and, absent proof of actual contamination, the policy exclusion did not bar coverage for the insured's losses. *Duensing*, 849 P.2d at 207.

propriate.'" *Auten,* 722 S.W.2d at 469, *citing,* Webster's Third New International Dictionary 889 (1981). *See also, Raybestos–Manhattan, Inc. v. Industrial Risk Insurers,* 289 Pa.Super. 479, 433 A.2d 906, 907 (1981), *quoting,* Webster's Third New International Dictionary ("[t]he word 'contaminate' is defined as follows: 'to render unfit for use by the introduction of unwholesome or undesirable elements....' Contaminate implies an action by something external to an object which by entering into or coming in contact with the object destroys its purity.").

Enron maintains B–G mix, in and of itself, is not "inappropriate" for injection into and transport via an oil pipeline. However true that may be, the fact remains Enron made the conscious business decision to inject B–G mix into the Portal pipeline, where it was commingled with the North Dakota Sweet Stream, and ultimately sold to Ashland for the applicable posted price for North Dakota Sweet crude oil rather than the much lower market price for B–G mix. Moreover, there is no question that the crude oil feedstock Ashland ultimately received as a result of Enron's deliberate actions was "inappropriate", as evidenced by the disruptions and damage to Ashland's refinery caused by the B–G mix.

The excess insurers obviously take the position the pollution exclusion is unambiguous and operates to exclude from coverage under the policy, Ashland's claims resulting from "contamination" caused by Enron's injection of B–G mix into the Portal pipeline. The court finds it difficult to conceive of a construction of the pollution exclusion that could be any broader than that advocated by the excess insurers.

Contamination occurs when there is a loss of purity, *i.e.,* where something is rendered impure by contact or mixture. *See, Myrick, supra,* 304 F.2d at 183. In the underlying, action, Ashland expressly alleged Enron contaminated the crude oil feedstock in the Portal pipeline by injecting B–G mix, a tariff-nonconforming substance, into the pipeline, thereby rendering the crude oil feedstock impure, less valuable and less useful. As alleged in Ashland's complaint, the B–G mix was a "foreign substance" that arguably contaminated the crude oil feedstock.[14]

 Although the governing policy does not specifically define "contamination," that term cannot be read in isolation, but must be construed within the context of the pollution exclusion.[15] The court refuses to give "contamination" the expansive definition urged by the excess insurers. Rather, the court concurs with Enron's position, *i.e.,* that "contamination" is an environmental term of art such that pollution exclusion clauses utilizing that particular term apply only to discharges of pollutants into the environment.

The court agrees with the reasoning of the Seventh Circuit Court of Appeals in *Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Company,* 976 F.2d 1037, 1043 (7th Cir.1992), which recognized that a "common sense approach" must be uti-

---

**14.** The governing policy contains a limitation on the application of the contamination exclusion, that is, where the contamination was "caused by a sudden, unintended and unexpected happening." In this court's opinion, the business decision on the part of Enron to inject B–G mix into the pipeline was not, by any stretch of the imagination, a "sudden, unintended and unexpected happening." The allegations of Ashland's complaint describe a calculated business scheme whereby Enron reaped profits in the millions of dollars by concealing the nature of its actions.

**15.** Pollution exclusion clauses are fairly common in insurance liability policies. Insurance companies added these provisions in an attempt to limit liability for environmental damage. *Westchester Fire Ins. Co. v. City of Pittsburg, Kan.,* 768 F.Supp. 1463, 1468–69 (D.Kan.1991). From an insurer's perspective, the practical reason for the pollution exclusion is to avoid, "the yawning extent of potential liability arising from the gradual or repeated discharge of hazardous substances into the environment." *West American Ins. Company v. Tufco Flooring East, Inc.,* 104 N.C.App. 312, 409 S.E.2d 692, 699 (1991), *quoting, Waste Management of Carolinas, Inc. v. Peerless Ins. Co.,* 315 N.C. 688, 340 S.E.2d 374, 381 (1986).

lized when determining the scope of a pollution exclusion clause. The court cautioned against reading a pollution exclusion clause too broadly:

> The terms "irritant" and "contamination", when viewed in isolation, are virtually boundless, for "there is no substance or chemical in existence that would not irritate or damage some person or property." *Westchester Fire Ins. Co. v. City of Pittsburg, Kan.,* 768 F.Supp. 1463, 1470 (D.Kan.1991). Without some limiting principle, the pollution exclusion clause would extend far beyond its intended scope, and lead to some absurd results. To take but two simple examples, reading the clause broadly would bar coverage for bodily injuries suffered by one who slips and falls on the spilled contents of a bottle of Drano, and for bodily injury caused by an allergic reaction to chlorine in a public pool. Although Drano and chlorine are both irritants or contaminants that cause, under certain conditions, bodily injury or property damage, one would not ordinarily characterize these events as pollution.

*Pipefitters, supra,* 976 F.2d at 1043.

The *Pipefitters* court went on to reference several other decisions rejecting the application of pollution exclusion clauses in contexts other than environmental pollution, noting:

> [t]he bond that links all these cases is plain. All involve injuries resulting from everyday activities gone slightly, but not surprisingly, awry. There is nothing unusual about paint peeling off a wall, asbestos particles escaping during the installation or removal of insulation, or paint drifting off the mark during a spraypainting job. A reasonable policy-

holder, these courts apparently believed, would not characterize such routine incidents as pollution.

*Id.* at 1044.

 Applying the "common sense approach" espoused in *Pipefitters,* the court is constrained to conclude the pollution exclusion in the governing policy is ambiguous when applied to the facts herein. The excess insurers have failed to define the limitations of their pollution exclusion clause in clear and explicit terms. The exclusion, if read as broadly as the excess insurers urge, would be virtually boundless and could conceivably impact the scope of coverage far beyond the reasonable expectations of the insured. *See, Wellcome v. Home Ins. Co.,* 257 Mont. 354, 849 P.2d 190, 193 (1993).

 Accordingly, the court, having considered the arguments advanced by the respective parties, concludes the governing policy's pollution exclusion does not preclude coverage for the claims advanced in Ashland's complaint.

IV.

B. *Public Policy*

Assuming *arguendo* the existence of coverage under the governing policy, the excess insurers contend Enron should be precluded, as a matter of public policy, from receiving indemnification for its actions. Specifically, the excess insurers maintain the public policy of the State of Montana precludes an insured from receiving indemnification for its intentional,[16] fraudulent conduct.

 Public policy generally bars coverage for an insured's intentional wrongdoing or criminal misconduct.[17] Underlying

---

**16.** The governing policy does not contain an express coverage exclusion for the insured's "intentional acts."

**17.** *See, e.g., Fedele v. National Liberty Ins. Co.,* 184 Va. 528, 35 S.E.2d 766 (1945) (elementary principles of public policy deny recovery to insured who fraudulently set fire to property covered by policy); *Cunningham & Walsh, Inc. v. Atlantic Mut. Ins. Co.,* 88 Or.App. 251,

744 P.2d 1317, 1319–20 (1987) ("to provide coverage for fraud would violate public policy"); *Wedge Products v. Hartford Equity Sales Co.,* 31 Ohio St.3d 65, 509 N.E.2d 74, 76 (1987) ("public policy is contrary to insurance against intentional torts"); *Ranger Ins. Co. v. Bal Harbour Club, Inc.,* 549 So.2d 1005, 1007 (Fla.1989) ("it is axiomatic in the insurance industry that one should not be able to insure against one's own intentional misconduct");

this public policy coverage bar is the concern that permitting coverage in certain circumstances will encourage insureds to engage in intentional misconduct. Barring coverage in these circumstances discourages insureds from intentionally harming others, as intentional wrongdoers cannot then rely on the availability of insurance to shield them from the civil consequences of their misconduct. *St. Paul Fire and Marine Ins. Co. v. Jacobson,* 826 F.Supp. 155, 162 n. 10 (E.D.Va.1993). Similarly, the public policy coverage exclusion bars insureds from recovering for self-inflicted wounds, thereby appropriately preventing insureds from enjoying the fruits of their wrongful acts. *Id.* at 163. Thus, not only does the public policy exclusion deprive intentional wrongdoers of the economic benefits arising from coverage of their wrongful acts, it reaffirms the "moral principle [that] no person should be permitted to allege his own turpitude as a ground for recovery." *Id., quoting, Ambassador Insurance Co. v. Montes,* 76 N.J. 477, 388 A.2d 603, 606 (1978).

■■■ Montana adheres to this general principle of coverage exclusion for intentional wrongdoing. Under Montana law, a contract by which a person seeks to exempt himself from responsibility for violation of the law or willful injury is void as against public policy.

> All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, for willful injury to the person or property

of another, or for violation of law, whether willful or negligent, are against the policy of the law.

Mont.Code Ann. § 28–2–702 (1995).[18]

The Montana Supreme Court has consistently held intentional acts are not excluded under an insurance policy unless the intentional act results in injuries which would be expected or intended. *See, Burns v. Underwriters Adjusting Co.,* 234 Mont. 508, 765 P.2d 712 (1988); *Mutual Service Casualty Ins. Co. v. McGehee,* 219 Mont. 304, 711 P.2d 826 (1985). In *McGehee,* however, the Court recognized that where an insured aggressively and intentionally struck another in the face, an intentional injury exclusion precluded coverage even though the resultant injury differed in character or magnitude from what the insured subjectively intended. 711 P.2d at 828 (citations omitted).

> [T]he act of striking another in the face is one which we recognize as an act so certain to cause a particular kind of harm that we can say a person who performed the act intended the resulting harm, and his statement to the contrary does nothing to refute that rule of law.

*McGehee, supra,* 711 P.2d at 828, *quoting, Jones v. Norval,* 203 Neb. 549, 279 N.W.2d 388, 391 (1979).

In *American States Ins. Co. v. Willoughby,* 254 Mont. 218, 836 P.2d 37 (1992), the Montana Supreme Court reaffirmed the existence of a public policy that precludes insurance coverage for acts that, by

*Couch on Insurance* § 39:15 (2d ed. 985) ("[a]ny insurance which purports to protect the insured against any loss which he may purposely or willfully cause, or which may arise from his immoral, fraudulent or felonious conduct, is void against public policy"); *Freedman's Richard's on Insurance,* § 1:13 (6th ed.1990) ("[i]t is universally recognized that an implied exception to coverage under any form of insurance is an intentional or expected injury, damage, or loss."). *St. Paul Fire and Marine Ins. Co. v. Jacobson,* 826 F.Supp. 155, 162 n. 10 (E.D.Va.1993).

**18.** In *Sagan v. Prudential Ins. Co. of America,* 259 Mont. 506, 857 P.2d 719 (1993), the Montana Supreme Court noted:

> Contracts of insurance ... are presumed to have been made with reference to the law of the land, including the statutory laws which are in force and are applicable, and such statutes ... enter into and become a part of the contract as much as if they were actually incorporated therein. Provisions of an insurance code are in the nature of special provisions pertaining to insurance contracts, which are superimposed upon those provisions of law which cover contracts generally.

857 P.2d at 721, *quoting,* 1 *Couch on Insurance* 2d (Rev. ed.) § 13:6.

their very nature, are certain to cause harm.

These types of action [hitting, biting and kicking directed towards individuals attempting to restrain the insured] are per se intentional and the intent to seriously injure is evident from the commission and type or nature of the act itself. Such actions cannot be the basis for policy coverage without vitiating the purpose of insurance. "[I]f a single insured is allowed through intentional or reckless acts to consciously control risks covered by policy, the central concept of insurance is violated."

*Willoughby*, 836 P.2d at 40, *quoting, Transamerica Ins. Group v. Meere*, 143 Ariz. 351, 694 P.2d 181, 186 (1984).

The purpose and intent of insurance is to protect the insured against loss, damage, or liability arising from contingent or unknown events. *See, Time Oil Co. v. Cigna Property & Cas. Ins. Co.*, 743 F.Supp. 1400, 1412 (W.D.Wa.1990). Restated, insurance policies are purchased "as protection against calamity." *Noble v. National American Life Insurance Company*, 128 Ariz. 188, 624 P.2d 866, 867 (1981). An insured seeks the safety of insurance against risks that are outside his control and the insurer agrees to cover certain risks for a premium based on actuarial calculations of the random occurrence of such events in a given population. *Transamerica Insurance Group v. Meere*, *supra*, 694 P.2d at 186. However, if an insured is allowed through intentional or reckless acts to consciously control risks covered by a policy, the central concept of insurance is violated. *Id.*, *citing*, 7A Appleman, *Insurance Law and Practice*, § 4492.01 at 21 (1979).

In the case *sub judice*, Ashland's complaint alleged Enron undertook a series of knowing and intentional acts designed to achieve tremendous economic gain at Ashland's expense. Specifically, Ashland's complaint contained allegations of misrepresentation, fraud, willful breach of contract, as well as a knowing violation of the law, *i.e.*, a breach of the Portal tariff. In addition, Ashland's complaint expressly alleged Enron conspired with other entities to sell B–G mix to Ashland,[19] in contravention of the Portal tariff, and thereafter, conspired to prevent Ashland from discovering the true nature of the material it was receiving via the Portal pipeline. Accordingly, the excess insurers assert the allegations regarding Enron's intentional, nonfortuitous, conscious risk-taking and calculated business decisions preclude, as a matter of public policy, indemnification for such acts.

In attempting to counter the excess insurers' argument, Enron maintains public policy does not preclude coverage "for the unintended results of intentional acts" and, as a result, coverage exists under the governing policy. Enron further contends the excess insurers' argument is simply an attempt to rewrite the terms of the governing policy.

Where an insured is alleged to have willfully or negligently violated the law, knowing it will obtain financial gain therefrom at another's expense, the insured may not, as a matter of public policy, contractually exempt itself from responsibility for its actions. *See*, Mont.Code Ann. § 28–2–702 (1995). Moreover, an insured may not receive coverage where he intended some harm, even if he did not intend all of the resulting harm. *See, State Farm Fire & Casualty Co. v. Abraio*, 874 F.2d 619 (9th Cir.1989); *Allstate Ins. Co. v. Kim W.*, 160 Cal.App.3d 326, 206 Cal.Rptr. 609, 613 (1984). Here, the intent to injure Ashland is evident from the "commission and type or nature of the act itself." *See*,

---

**19.** Ashland's complaint alleged that Enron, from November, 1982 until March, 1984, injected approximately 2,000 barrels per day of B–G mix into the Portal pipeline at Reserve, Montana, and charged Ashland the price for sweet crude oil, which was approximately $5 or $6 per barrel higher than the market price for B–G mix. Accordingly, Ashland alleged Enron profited in excess of $5 million dollars from its wrongful conduct from the Reserve injection site alone.

*Willoughby, supra,* 836 P.2d at 40. Enron's contentions regarding its subjective intent are irrelevant.

■ The instant case implicates the policy considerations that generally trigger operation of the public policy coverage bar. The first and foremost policy consideration is whether a determination of coverage would allow a wrongdoer to unjustly benefit from his wrong. *See, Jacobson, supra,* 826 F.Supp. at 164, *citing, Vigilant Insurance Co. v. Kambly,* 114 Mich.App. 683, 319 N.W.2d 382, 384 (1982).[20] To allow Enron to reap the benefits of its intentional and willful conduct by compelling the excess insurers to provide indemnification for the Ashland settlement is a conclusion that does not square with public policy or the accepted standards of fair play. The losses for which Enron seeks indemnification are the direct result of its own intentional acts and calculated business decisions, which Enron knew or should have known were designed to cause injury to Ashland and its refinery. Consequently, Enron is not entitled to indemnification, as a matter of public policy, from the excess insurers for its purported losses.

### CONCLUSION

Therefore, for the reasons set forth herein, the court concludes the motion for judgment on the pleadings filed on behalf of the excess insurers is well taken and appropriately GRANTED. Likewise, the court concludes Enron's motion for summary judgment is appropriately DENIED.

IT IS SO ORDERED.

---

**20.** The other policy considerations include (a) whether the insured was induced to engage in the unlawful conduct by reliance upon the insurability of any claims arising therefrom; (b) whether allowing insurance coverage would induce future similar unlawful conduct by practitioners; and (c) was the policy obtained in contemplation of a violation of the law. *Jacobson, supra,* 826 F.Supp. at 164, *citing, Vigilant Insurance Co. v. Kambly,* 114 Mich.App. 683, 319 N.W.2d 382, 384 (1982).